## JOHNSON and others *vs.* BUSH and wife.

The date of the incorporation of a company, under the provision of the revised stat utes declaring that if any corporation created by the legislature shall not organize and commence the transaction of its business within one year from the date of its incorporation its corporate powers shall cease, is the time when the act creating the corporation takes effect as a law.

The fair construction of the act of April 14, 1838, amending the act to incorporate the Globe Fire Insurance Company, by which the directors named in the original act were continued in office until the 2d Tuesday of May, 1839, and were authorized to open the books of subscription again, and to receive subscriptions for the purpose of filling up the capital stock of the company, is that it extended the time for the organization of the company, and for the commencement of its business, one year; although that act does not in terms extend the time for the commencement of the business of the company.

An assignment, by the officers of a corporation, of a bond and mortgage exceeding one thousand dollars and constituting a part of its capital stock, is void; unless made in pursuance of a previous resolution of the board of directors authorizing such assignment.

But it seems that the proof by the subscribing witness to such an assignment, before the commissioner of deeds, that the corporate seal was affixed to the same by the authority of the corporation, is *prima facie* evidence that the assignment was authorized by the board of directors.

If an assignment of that nature is duly authenticated for the purpose of authorizing it to be recorded, it may be received in evidence, without further proof; subject, however, to the right of the adverse party to show that it was not duly executed by the corporation, because no resolution of the directors had authorized the person entrusted with the corporate seal to affix the same to such an assignment.

Where, by statute, a resolution of the board of directors of a corporation is necessary to authorize an assignment of corporate property by the officers of such corporation, a certificate of proof before the acknowledging officer that the corporate seal was affixed by the officer entrusted with such seal by the corporation, is not alone sufficient to authorize such assignment to be recorded, or to be read in evidence without further proof.

A corporation has no legal power to take a surrender of a part of its capital stock,

Johnson *v.* Bush.

not for the purpose of issuing new scrip therefor to other persons, upon being paid or secured the amount of the same from them, but as an extinguishment of a part of the capital of the company, and to give up the property or effects of the company in exchange for the same. And the assignment of a bond and mortgage, held by a corporation, in pursuance of such an arrangement, being in direct violation of the provisions of the statute, the assignee will acquire no legal or equitable right to such bond and mortgage by such an assignment.

Where a corporation took from one of its stockholders a surrender of twenty shares of its capital stock, held by him, and endorsed the amount of the par value thereof upon a bond and mortgage which it held against him, and then assigned the residue of the debt secured by that bond and mortgage, to certain other stockholders, upon the surrender of the stock held by them; *Held* that both transactions were in direct violation of the provisions of the statute prohibiting the directors of any moneyed corporation from dividing, withdrawing, or in any manner paying to the stockholders any part of the capital stock of the corporation, without the consent of the legislature.

A deed executed by an attorney may be recorded, upon his acknowledgment before the proper officer, or upon due proof that such deed was executed by him; without proving the power under which the attorney acted in executing such deed.

THIS case came before the chancellor upon an appeal, by the complainants, from a decree of the vice chancellor of the eighth circuit, dismissing the bill of the appellants, with costs. The bill was filed to foreclose a mortgage given by Bush and wife to the Globe Fire Insurance Company, in 1839, to secure the payment of $7000, being the amount of the purchase of seventy shares of the capital stock of the company, and for which scrip was issued to Bush and to others at his request, or by his direction. The act for the incorporation of the Globe Insurance Company was passed on the 2d of May, 1837, and became a law on the 22d of the same month, under the provision of the revised statutes on that subject. The first directors were named in the act of incorporation, and were to continue in office until the 2d Tuesday of May, 1838; when directors were to be chosen by the stockholders of the company. The stock of the company not having been subscribed and paid or secured, so as to authorize the corporation to organize and commence the transaction of its business, on the 14th of April, 1838, an amendatory act was passed continuing the directors, named in the original act of incorporation, in office until the 2d Tuesday of May, 1839. And the directors were authorized

to open the books of subscription again, and to receive subscriptions from time to time, for the purpose of filling up the capital stock of the company, upon the like notice of·each time of opening the books of the company as was required by the original act.

The deposition, required by the act of incorporation, that the whole capital stock had been paid in or secured to be paid, was made and filed the forepart of April, 1839; and the company thereupon immediately organized and commenced the transaction of the business for which it was incorporated. To enable the officers of the company to make the necessary affidavit, however, some of the stockholders had to subscribe for, a further number of shares of the stock, amounting in the aggregate to $160,000; the whole of which stock was paid for, or secured to the company, in conformity with the provisions of the charter. But as some had subscribed for portions of the stock, who had neglected to furnish their securities therefor in time, and it was expected that others would desire to take a part of this stock as soon as the company was in operation, it was understood between the directors of the company and the respective subscribers of this last $160,000 of the stock, that the other applicants should be permitted to become the owners of such stock upon paying the amount thereof, or on giving approved security therefor; to be substituted in the place of the securities given by the original subscribers for that part of the stock. The stock for which the bond and mortgage of Bush and wife were sub-·sequently taken, was a part of this $160,000; which had been subscribed for originally by D. E. Tylee. And the security of Bush and wife having been approved of, in August, 1839, by the counsel to the board, it was received in full of the stock, except as to 12 shares which were assigned to trustees, for the security of the company, until Bush should have made certain contemplated improvements upon the mortgaged premises whereby the value thereof would be enhanced. Of the other 58 shares, the scrip for eight shares was issued to Bush, and the scrip for the residue was given to the complainants at

Bush's request; and for which they credited the amount to the firm of which he was a member, at its nominal or par value.

About the commencement of 1840, the company, having met with considerable losses, resolved to wind up their affairs and call in their stock, by receiving surrenders of the stock and giving up the securities of the holders thereof; taking the bonds of the stockholders for ten per cent of the amount, to cover any losses which had occurred upon the stock. Under this arrangement, the eight shares of the stock issued to Bush, and the twelve issued to the trustees for him, were surrendered to the company, and the amount of the par value thereof was endorsed upon the bond and mortgage. The complainants also surrendered their fifty shares to the company, and, with the assent of Bush, the company assigned to them the mortgage of Bush and wife; the complainants giving their bond to the company for ten per cent on the whole seventy shares to meet anticipated losses. The assignment of the bond and mortgage to the complainants, upon the surrender of the seventy shares of stock, was under the corporate seal of the company, and was signed by the president and witnessed by the secretary thereof. And the assignment was proved before a commissioner of deeds, and was duly recorded. Upon proving it before the commissioner, the attesting witness, the secretary of the company, swore that the seal affixed to the assignment was the corporate seal of the company, and was affixed thereto by its authority. But no resolution of the board of directors, authorizing the assignment of the bond and mortgage to the complainants, was given in evidence; nor was the secretary of the company, who was examined as a witness in the cause, asked by either party whether such a resolution was ever adopted, or how he knew that the corporate seal was affixed to the instrument by the authority of the corporation; at the time he proved the execution of the assignment before the commissioner.

The vice chancellor decided that the assignment of the bond and mortgage to the complainants was illegal and void, because it constituted a part of an arrangement to surrender a portion of the capital of the company, in exchange for it, in violation

Johnson *v.* Bush.

of the statute on that subject.   He therefore dismissed the complainant's bill.

The following opinion was delivered by the vice chancellor.

F. WHITTLESEY, V. C.   The defendants insist that the charter of the Globe Fire Insurance Company had ceased to exist before it attempted to go into operation.   The act incorporating it was passed May 2, 1837.   It made the corporation subject to the provisions of chapter 18, part 1, of the revised statutes, so far as applicable.   The 29th, 30th and 31st sections of that chapter, provide that the officers of such corporation, before it commences business, shall make and file in the office of the county clerk an affidavit that the whole capital stock has been paid or secured.   And if such affidavit is not made and filed within one year from the time when the charter is granted, then the charter to be void.   (1 *R. S.* 595.)   This charter then, in effect, required the capital to be paid in or secured within one year from the date of the grant.   The amendment passed April 14, 1838, does not, in terms, give a longer time. It provides for continuing the directors named in the former act in office until May, 1839, and for opening the books of subscription in pursuance of the sixth section of the former act.   And in case the full stock is not subscribed for upon opening, to appoint other times and places for filling the stock.   (*Laws of* 1838, 191.)   It is urged that there are no precise words extending the time for filling the stock beyond a year; nor any language in the amended act which, by any necessary implication, would so extend the time, even if it could be deemed to be extended by any implication.   The amendment became a law before the year from the passage of the first act had expired, and it is claimed that all its provisions are entirely consistent with the original limitation of one year.   And that as the company was not organized until long after the lapse of the first year, the charter is void.   And that any contract assumed to be made with a corporation which had no existence is void also.   This is a question in which the company and its stockholders are deeply interested, and is of vital importance to

them; and it would not be desirable to decide it in a collateral way between litigants who are strangers to the company, unless there was an absolute necessity for it. That necessity does not exist in this case as it is now presented. The present case can be disposed of upon more satisfactory grounds; and for that reason the question will be left open.

The defendants contend, further, that if the time for filling the stock was extended by the amended act, it was not filled within the additional year, from the passage of that act. For they claim that the subscription by Graham and others of $160,000 was not bona fide, or, if bona fide in a certain sense, that the withdrawal of the securities paid for it, and the substitution of the mortgage of the defendants and others, was a withdrawal of capital; which was illegal and void. Upon this point I understand from the testimony that Graham and others subscribed for $160,000, to fill the capital and enable the company to go into operation; that they either paid or secured this subscription in the same manner as the other subscribers, and to the satisfaction of the directors; as indeed they must have done, before the officers could make the affidavit required by the revised statues preliminary to commencing operations. While these subscribers were legally bound to pay for this stock, or rather bound to pay the securities which they had given for it, and they had a legal right to claim this stock as their own property, there was yet an understanding, not legally binding upon any one, that if other stockholders should apply, who could give approved securities, such applicants should be supplied from this special stock, and should pay or secure the company, and that the securities of Graham and others should be diminished to that amount. Bush was supplied out of this reserved stock; and I can see nothing in all this transaction, so far as it appears from the testimony, which was improper, or in violation of any law. We must assume, in the absence of positive proof to the contrary, that the subscription for the $160,000 was made *bona fide* and was fairly secured; and it is not urged that the mortgage substituted by Bush was a weak security given in lieu of a valuable one withdrawn. If

indeed available securities for the capital stock were withdrawn, and nominal securities substituted, it would be a fraud upon the other stockholders, and bring it within the case of *Nathan* v. *Whitlock*, (9 *Paige*, 152.) But I do not deem such to be the case in this instance; and I see no reason to question the validity of the mode of proceeding which was adopted.

Another objection taken by the defendants is as to the validity of the assignment from the company to the complainants. One of the provisions of the revised statutes as to moneyed corporations is, that no conveyance, assignment or transfer, not authorized by a previous resolution of the board of directors, shall be made by a corporation, of any of the real estate, or any of its effects exceeding the value of one thousand dollars. (1 *R. S.* 691.) This assignment is executed by the president and secretary of the company and the corporate seal affixed, and is proved before a commissioner of deeds, to enable it to be recorded. The secretary, by whose oath it is proved for that purpose, swears that he affixed the seal by authority of the corporation. The instrument itself, thus proved, is all the proof of the assignment which is offered. No previous resolution of the board of directors authorizing the execution of this instrument is produced. I am of the opinion that the proof thus offered of the conveyance of the interest of the company in this mortgage to the complainants is insufficient. But this defect in proof might possibly be cured if the facts enabled the complainants to do so at the expense of some costs. (6 *Paige*, 54, *contra.*)

There are however more serious objections to this assignment. The complainants were the owners of fifty shares of the capital stock of this company; and the bond and mortgage executed by the defendants were so executed in payment of seventy shares of the capital stock of the same company. The consideration for the assignment of this bond and mortgage, was the surrender, cancellation and destruction of those fifty shares of capital stock. The bond and mortgage represented so much of the capital of the company; and its cancellation to the extent of $2000, and its assignment for the

remainder, was in effect a withdrawal of so much capital of the company, without legislative authority or judicial direction. This court held, in the case of *Pettibone* v. *Hawkins*, that the directors of a banking association had no power to contract to give up securities held by them in payment for subscriptions to their own stock, upon the surrender and cancellation of such stock. And in another case, (*Mather* v. *Bates*,) it was decided that the directors had no power to make such a contract, even by the direction of a majority of the associates at their annual meeting. This was decided in relation to associations which were considered not to be subject to the provisions of the revised statutes in relation to moneyed corporations; but it was so held upon general principles. Insurance companies and moneyed corporations are subject, expressly, to the provisions of the revised statutes. Among those provisions is the following: "It shall not be lawful for the directors of any moneyed corporation to divide, withdraw, or in any manner pay to the stockholders or any of them, any part of the capital stock of the corporation, or to reduce such capital stock, without the consent of the legislature, or to receive any shares of capital stock in payment or satisfaction of any debt due the corporation," with certain exceptions. This bond and mortgage was a debt due to the corporation; it was a part of its capital stock. The company received from the complainants fifty shares of its own stock for this debt; and by the assignment of the debt, so much of the capital stock was withdrawn. This whole transaction seems to come within the plain prohibitions of the statute; and shows an attempt on the part of this corporation to withdraw and reduce its capital stock, and so far to wind up its concerns without the authority of the legislature, or the sanction of a judicial tribunal. This is clearly forbidden. (*Ward* v. *The Sea Insurance Co.* 7 Paige, 294. *Nathan* v. *Whitlock*, 9 *Id*. 152.) And from the ordinary consequences of such acts forbidden by statute the assignment must be held to be void.

The complainants thus fail to maintain the title to the bond and mortgage, which they have set up in their bill. And con-

Johnson *v.* Bush.

sequently their bill should be dismissed. It is accordingly dis-missed with costs.

*Geo. Wood,* for the appellant. I propose, in the first place, to answer the grounds on which the court below reposes, in support of the decree appealed from. The first point decided by the vice chancellor is, that it does not appear that the assignment of the bond and mortgage in question was made to the complainants, under a resolution of the board of directors, according to the provision of the revised statutes. The seal of the corporation is affixed to the assignment, with the signature of the president and secretary; all which is proved and recorded. It was not necessary to produce the original resolution, or to produce and prove a copy. The seal, with the correspondent attestation, being proved, is sufficient. This was so held by the chancellor in *Lovett* v. *The Steam Saw Mill Association,* (6 *Paige,* 54.) It is a well settled principle that the proof of the seal is evidence, *per se,* that the previous authorization was complied with. The fallacy in the views of the vice chancellor results from his mistaking the object of the statute. The object of the act was to prevent officers of corporations from disposing of the real estate and effects, under mere general agencies; and to require that they should have a specific resolution of the board to that effect. The act did not design to change the rule of evidence. An authority to affix the seal was just as necessary before the passing of the act as since; and if affixed without authority it was void. If before the act, an instrument with the corporate seal affixed had been produced in court, it might have been read in evidence upon showing it was sealed with the seal of the corporation. But it would have been competent for the other party to show that the seal was put there without authority, by a person not authorized. The same course of proceeding will take place now. The party alleging the want of authority must show it now, after the proof of the seal, as before the passing of the act. The same sort of circumstantial evidence will be allowable to him in proving a negative act, viz. the want of authority. In making out this

fact of authority, the change made by the statute operates. Now it must be by a specific resolution of the board; before, it was by general authority, which might be shown by mere usage. This construction is conformable to the decision of the chancellor before cited, and is conformable to usage. It has not been the practice, under the act, to make proof of this specific resolution, in order to have deeds and mortgages recorded. The proof, as taken in this case, has always been deemed sufficient.

The vice chancellor's second ground is that the contract and arrangement under which the bond and mortgage were assigned by the company to the complainants were illegal, against the policy of the statute, and void. To this I answer, in the first place, that it was not against the policy of the statute; that the object of the act was to prevent directors from thus assigning the assets of the corporation and taking stock in lieu thereof—but it might be done by them if approved of by the stockholders and creditors of the company; which I am informed was done in this case.

But I deem it unnecessary to enlarge upon that view of the case. I shall now assume the assignment of the bond and mortgage to have been made under an illegal contract. No doubt this bond and mortgage were good and binding against the defendants. They were executed as well by the wife as the husband, and there is nothing in the proofs to impeach them. The assignment was complete; fully executed and delivered. The effect of this assignment, thus executed, was to pass to the plaintiffs the complete title and interest in the bond and mortgage. (*Raymond* v. *Squire*, 11 *John. Rep.* 47. *Moore* v. *Trumbull*, 5 *Cow.* 488.) The contract under which the assignment was made, was completely executed on both sides; the company got the full consideration, and the appellants got a complete title to the bond and mortgage. If the transaction was infected with illegality, both parties were in *pari delicto*, or at least, the fault on the part of the company who transferred was as great as that of the appellants, if not greater. When the parties are in *pari delicto* and the contract is executed, it is well settled that neither party can rescind it.

(*Vischer* v. *Yates*, 11 *John. Rep.* 28. *Comyn on Contracts*, 109, 120. *Chitty on Cont.* 214, 192, 3. *Yates* v. *Foot*, 12 *John. Rep.* 1. 8 *Id.* 575, 120. 2 *Cow. & Hill's Notes*, 1446. 3 *Taunt.* 277. *Douglas' Rep.* 470. 8 *East*, 381, *n.* 2 *Bos. & P.* 467. 4 *Camp. Nisi Prius Rep.* 37, 157.) In case of illegal contracts, where money or goods are delivered, not to the party to the contract, but to a third person to be appropriated to his use, the third person cannot object to paying them over; nor can they be recovered back. (1 *Bos. & P.* 3, 4, 296. 1 *John. Cases*, 158. 12 *John. Rep.* 1. 11 *East*, 52. 3 *Price*, 58. 2 *Barn. & Ald.* 642.) Money is not recoverable back when the contract is executed, and the parties are in *pari delicto*. (*Chit. on Contracts*, 638. 3 *Term Rep.* 266. 8 *Id.* 575.) The defendants, as mortgagors, must pay to somebody. All they can ask is to be protected in the payment of the debt to the holder. If the company, who were the original holders of the bond and mortgage, cannot get them back from the appellants, the latter have the right to hold and collect them. The title is in them, as against the company. Of course the defendants will be protected in paying to the appellants; which is all the defendants can require.

Even where a third party is in some measure mixed up with the illegal contract—as where he has received money or property under it, to be delivered from one party to the other in the original contract—his position in respect to it being one remove from the illegal contract, the property delivered cannot be recovered back from him. On the other hand, he cannot be protected from paying it over. (*Story on Agency*, 354, 356.) But the debtor in this bond and mortgage was not at all participant in the illegal assignment. He owes the debt, and has a right to be so far protected as to be able to make a final payment without further recourse to him. This he can do, as I have clearly shown, by paying it to the appellants, who are the holders thereof. A third party cannot object to a contract, where the parties to it have gone too far for themselves to object. And generally speaking, a third party cannot take the objection when he is not in any wise concerned in the performance of the con-

tract. (6 *Term Rep.* 557.) Jurists are sometimes led astray by assuming an analogy between such cases as this and assignments infected with usury. It has been a mooted question whether the assignee, in the latter case, takes such a title as will enable him to recover. But the analogy does not hold. The parties to the usurious agreement do not stand in contemplation of the usury law on equal grounds—in *pari delicto.* The borrower is considered the party aggrieved, and the design of the law is to relieve him; and hence the assignee may impeach the assignment which is infected with usury. But the cases are by no means uniform on this point of usury. I think therefore, the vice chancellor erred in supposing that the complainants, as assignees and holders of this bond and mortgage, had not such a title as would enable them to recover against the defendants.

Some other points were raised before the vice chancellor, though not passed upon by him, but which may be again presented on the other side, upon the appeal, for the consideration of the chancellor. It was contended that the affidavit that the whole capital stock was subscribed for and paid, or secured, was not made within one year from the passing of the act of incorporation; as required by the statute. (1 *R. S.* 595.) The act of incorporation was passed on the 2d of May, 1837. The amended act was passed 14th April, 1838; and provided for continuing the directors named in the former act, in office until May, 1839, and for opening the books of subscription in pursuance of the 6th section of the former act; and in case the full stock was not subscribed upon one opening, to appoint other times and places for filling the stocks. It is contended on the part of the defendants that the amended charter does not extend the time for filling up and paying for the stock; and the vice chancellor appears to consider it a very grave question and very important for the stockholders. I presume it will not be pretended that such an extension of the time, for subscribing and paying for the stock, must be found in express words in the statute. It may be implied, if the whole contents of the amended act will fairly warrant the implication. Rights and privi

leges may be implied in an act conferring a franchise, as well as in any other statute. Does the amended charter, then, warrant such an implication? If not, why does it continue the original directors another year? Why provide for opening the books, pursuant to the sixth section of the original charter, and for appointing other times for opening them? Surely all this was not done to enable them to fill up the subscriptions and pay for the stock within the first year. That was already provided for in the original act. These various provisions in the amended act are all senseless and absurd, unless the legislature meant thereby to extend the time, for subscribing and paying, beyond the first year. And if they did mean so to extend it, they manifestly meant to continue it thus the second year, during which the original directors were to continue in office. The object of so continuing them in office for the second year was to enable the subscriptions and payments to be made; and the time for doing so must of course be held to be co-extensive with the continuance of the directors for that purpose.

Another point raised in the court below was, that the arrangement under which the bond and mortgage were assigned to the complainants, was infected with usury. To this I answer that there was no loan, direct or indirect. On the contrary, the assignment was made under an arrangement which did not at all partake of the character of a loan. The whole transaction shows this. To constitute usury there must be a loan. (*Comyn on Usury*, 22, 59. *Ord on Usury*, 29.) The agreement for the assignment in this case was complete at the date of the assignment. The rights of the respective parties to the property to be transferred, were mutually recognized by both parties at that time. The delay occurred for the convenience of the parties in carrying out their arrangements. If any profits or dividends accrued upon the stock in the meantime, they enured to the benefit of the company. Arrangements of this kind, where there has been some delay in carrying them out, and they are referred back to the time the contract was considered as complete by the parties, ought not to be considered usurious, where it appears from the whole complexion of the case to be

Johnson *v.* Bush.

bona fide, and not a cover for usury. (*Dowdall's ex'rs* v. *Lenox,* 2 *Edw. Ch. Rep.* 272.) Usury, in this case, was not properly pleaded. Both at law and in equity the usurious agreement must be specifically set forth. (*Comyn on Usury,* 203. 8 *Paige,* 452.) The usurious agreement in this case is not set out with the particularity required by the rules of law. And surely there is nothing in the defence, in this case, which entitles it to any extraordinary indulgence.

*S. Mathews,* for the respondents. The bond and mortgage, which are the subject of this suit, are not valid, because the Globe Fire Insurance Company, the mortgagee named in the mortgage, was not a legally constituted corporation, and was not therefore capable of taking the bond and mortgage in question. By the revised statutes, (*vol.* 1, *p.* 600, § 7,) it is provided that if any corporation thereafter created by the legislature, shall not organize and commence the transaction of its business within one year from the date of its incorporation, its corporate power shall cease. The act incorporating the Globe Insurance Company was passed May 2, 1837. (*Laws of* 1837, *p.* 328.) It is in proof that the company did not organize nor commence business until some time in April, 1839; nearly two years after its incorporation : so that unless the complainants can show some other act of the legislature repealing the above 7th section of the revised statutes, or exempting that company from its operation, it is clear that it was not a corporation, at the time the mortgage was executed. The complainants contend that the act of April 14, 1838, (*Laws of* 1838, *p.* 191,) has the effect of a re-enactment of the act of 1837, or of re-incorporating the company as of the date of the last act. It will be necessary to examine the provisions of the act to see whether it will bear such a construction. The act is entitled an act to amend, &c. the act of 2d May, 1837. The first section is in these words, " The persons named in the first section of the act entitled, &c. to which this is an addition, shall continue in office, as the first directors of such corporation until the second Tuesday of May, 1839." The second section provides that the

books of subscription may be opened a second time, and oftener if the whole capital shall not be subscribed at the time first appointed; and refers to the 6th section of the act of 1837, for the mode of receiving subscriptions and giving notice. Now there is nothing in this act of 1838, which conflicts with the 7th section of the revised statutes. The language of that section is clear and explicit. The charter of this company was received by the corporators upon the condition there imposed, and there is nothing in the act of 1838 to release them from it. Continuing the directors named in the first act in office for another year, is no evidence that the legislature intended to release the condition; because directors are frequently continued in office beyond the year, by original acts of incorporation. Indeed this was done by the charter of this same company. By the 2d section of the charter, the first directors were to hold their office until the second Tuesday of May, 1838, a week at least, and perhaps longer, after the expiration of the year within which the company was required to organize, or in default thereof to forfeit their corporate powers. The only operation of the act of 1838, was to amend the act of 1837, in the two particulars of continuing the directors in office for two years, instead of one, and of allowing the books of subscription to be opened a second time, after a failure to fill up the capital stock on the first opening; and the two acts taken together must receive the same construction as if the whole had been contained in the first enactment. It is said, on the other side, that the provisions of the act of 1838 are senseless and absurd, unless it was the intention of the legislature to extend the time to fill up the capital stock. But it will be seen that there was at least eighteen days after the passage of the last act within which the company might have filled up the stock, and have gone into operation. There was therefore ample time for that purpose. If the company had done so, the provision enlarging the term of office of the directors would have harmonized perfectly with the other provisions of the charter, and with the revised statutes. The counsel asks, why provide for opening the books pursuant to the 6th section of the original charter

and for appointing other times for opening them? I answer that the original charter did not appoint "*other times,*" and for that reason an amendment was necessary. It is possible, indeed I may say it is highly probable, that the directors had, before the passage of the last act, opened the books and had failed to obtain the subscriptions required; and they needed this amendment, therefore, to enable them to appoint another time. If I am right in a previous suggestion, this amendment had the effect of enlarging the powers, as conferred by the 6th section of the original charter, by authorizing the directors to appoint a second time for receiving subscriptions, after the first had failed. The original charter was certainly defective in that particular, and needed amendment. This is not a case where it can be said that the legislature had waived the forfeiture; because there was no forfeiture when the amended act of 1838 was passed, nor was a forfeiture at that time inevitable. Where the legislature intend to renew an act of incorporation, the language is explicit; and is remarkably uniform in all the cases which I have examined. (*See Laws of* 1837, *ch.* 393, 398, 405, 464; *Laws of* 1838, *ch.* 283, 303, 311, 322, 147, 167, 168.)

The capital stock of the company was never fully subscribed and secured, so that although the affidavit required by law to be filed, was made and filed, yet the testimony shows that this was a fraud upon the law. It appears from the testimony of Allen and Martin, the president and secretary of the company, that subscriptions were made by some of the directors to the amount of $160,000, to enable the company to go into operation; and that it was agreed between the board of directors and those gentlemen, that other subscriptions and other securities might afterwards be substituted. The act doubtless contemplated a bona fide subscription to the capital stock, and a bona fide payment or security of the amount subscribed. But the subscription in this case was qualified and conditional. The subscribers had a right, by their agreement with the directors, to withdraw their subscriptions and substitute others. The object of the law might, in that way, be wholly defeated. The

president and secretary might make the required affidavit, and then other subscriptions and securities might be substituted, of a quality far below the standard prescribed by the law. If the principle be once admitted that a proceeding of this kind is lawful, it opens a door for the greatest frauds. It appears, by the evidence, that the agreement between the directors and the subscribers of the $160,000 was carried out; for these subscriptions were afterwards actually given up, and others substituted. Bush's subscription of $7000 was one of the substituted subscriptions; and the application was made to the directors directly, and the stock was issued to him. This shows most clearly that the subscriptions of $160,000 were not real or bona fide. It was a mere temporary expedient, and the whole arrangement was intended to give a fictitious existence to the corporation. We say it was a fraud upon the law. The law contemplates a bona fide subscription, and so as to give to the public, and those dealing with the corporation, the security of a real and substantial capital. If, therefore, the subscriptions were a fraud upon the law, the company had no existence when the mortgage of Bush was given; and the mortgage is accordingly void.

But if the subscriptions of Graham and others were valid and the securities given by them were also valid, those securities formed a part of the capital of the company, and could not be withdrawn. The mortgage of Bush and wife having been given on the withdrawal of so much of the securities of Graham and others, and being substituted therefor, the transaction was illegal; and the bond and mortgage in question were without lawful consideration and were void. The bond and mortgage were not actually consummated until the 27th of August, 1839; though they purport to bear date in April previous. August was the time of the actual delivery, and when they first had an available legal existence. This corporation is a moneyed corporation, as defined by the revised statutes, and could not commence its business until the officers made and filed an affidavit that the whole capital had been paid in, or secured, according to the terms of the charter. This affidavit must have been ale-d

in April, 1839 ; before the bond and mortgage of Bush and wife was given. If then the $160,000 subscribed by Graham and others, and the securities given therefor, formed a part of the capital subscribed and secured, and on which the affidavit of the officers was predicated, neither the subscriptions nor the securities could be given up and others substituted, without the consent of the legislature. The revised statutes (1 *R. S.* 591) expressly prohibit it. (*See also Nathan* v. *Whitlock*, 9 *Paige's Rep.* 152.) The effect of this transaction was to surrender $7000 of the original securities taken by the company, and substitute others in their stead. The original subscription too, to that extent, was cancelled, as must be inferred, and the subscription of another person substituted. If this should be allowed, why may not the whole object of that provision of the revised statutes be defeated ? What security have the public, from the making and filing the affidavit, if the next day the di rectors may surrender all the securities on which it was predicated and substitute others? The charter requires that the mortgages taken for the capital stock shall be upon real estate worth fifty per cent more than the amount charged thereon. What security then have the public that the new securities will be of that character? If the corporation had been legally constituted and the whole capital had been subscribed, the company could not issue any more stock. The issue of $7000 of stock to Bush, therefore, was an excess, beyond the capital, which the company had no power to issue ; and the se curity given for it was without consideration and void.

Again ; the assignment of the bond and mortgage to the complainants by the Globe Insurance Company is void. There was no resolution of the board of directors authorizing the assignment. And the assignment having been made on a surrender of the stock of the company, it was a withdrawal of so much of the capital of the corporation, and was contrary to law and void. The revised statutes (1 *R. S.* 593, § 8) declare that no conveyance, assignment or transfer, not authorized by a previous resolution of the board of directors, shall be made by any moneyed corporation, of any of its real estate, or of any of its

Johnson *v.* Bush.

effects, exceeding the value of \$1000. There is no proof in this case, that the assignment of the bond and mortgage to the complainants was authorized by a previous resolution of the board. The certificate of the commissioner is no evidence of the fact, even if it certified so much ; because it is not the kind of proof required. It is not the mode of proving such a fact, in this court. That might do in the case of an ordinary corporation to which the statute did not apply ; because in such cases a resolution of the board of directors or trustees is always, or generally, implied, when the instrument is executed by the proper officers under the corporate seal. But in the case of moneyed corporations, the legislature evidently intended to impose a special and salutary restraint, upon the assignment and transfer of their effects by the officers of such corporations. The counsel for the appellants has attempted to show that it was unnecessary to prove this resolution, and he cites, as an authority in support of this position, the case of *Lovett* v. *Steam Saw Mill Association*, (6 *Paige's Rep.* 54.) But that was a case of an ordinary corporation, and to which the statute did not apply. The evidence in such cases is governed by the rules of the common law. And while at the common law a resolution is necessary to authorize a grant or conveyance, yet the courts, in giving effect to conveyances of corporations, always presume a resolution when the seal is affixed, with a proper attestation. The statute has changed the rule in respect to moneyed corporations, and the legislature did not mean to leave it to mere implication. The resolution in such cases forms an essential and indispensable part of the assignee's title. It is a condition precedent, and should be proved. The resolution should have been stated and set forth in the bill. It is a well settled rule of pleading, in this court, that the complainant must set forth in his bill his interest in the subject matter of the suit, or a right in the thing demanded, and a proper title to institute a suit concerning it. (*Mitf. Plead.* 154. *Story on Plead.* 214, § 257. 1 *Mylne & Keene*, 61. 1 *Molloy*, 603.) In the last case, the rule as above laid down is recognized, but the words " *duly authorized*" were held to be sufficient in the bill. The

Johnson *v.* Bush.

bill in this case does not set forth, nor refer to, the resolution. It merely states that the company assigned the bond and mortgage. The resolution therefore is not put in issue. And will the court imply its existence when it has neither been put in issue nor proved? I think not; and I therefore insist that not only is there no proof of the resolution, but that the bill is defective, and so much so, that no proof could supply it. The appellants' counsel seems to suppose that the object of the statute was to prevent officers and agents of corporations from disposing of the real estate and effects under mere general agencies. I think the object and policy of the statute was to protect the stockholders from the loose practice which had obtained, of making transfers and conveyances by the officers of corporations, without the deliberate sanction of the board of directors. It is notorious that such a practice had prevailed in many of our banks and insurance companies, to the great injury of the stockholders and of the public. The legislature intended to correct the evil, and to prevent, as far as this enactment would do it, the officers of corporations from wasting the funds of their institutions. They are now required to have the sanction of the board of directors to all transfers of real estate and other effects of the value of $1000. But whatever may have been the intention of the legislature, or whatever may be the policy of the enactment, the letter of the law is plain and positive, and cannot be disregarded.

The assignment having been made on a surrender of the stock of the company, it was a withdrawal of so much of the capital of the corporation, and was therefore contrary to law and void. I have before shown that the company were prohibited by law from withdrawing any part of their capital stock, without the consent of the legislature. Indeed, the statute on this subject is so plain and unequivocal that no argument in support of the position is necessary. The only question under this point is, whether the circumstances under which the assignment of the bond and mortgage, and the surrender of the stock by the complainants were made, amount to a withdrawal of the capital. Assuming, for the purpose of this part of the

argument, that the bond and mortgage was a valid security in the hands of the company, it then formed a part of the capital of the corporation. It was given, as the appellants insist, for the stock of the company. It was, as they say, an original security for so much subscribed to the capital stock. It was assigned to them on a surrender of the stock for which it was given. The amount of the bond was in the first place reduced by an endorsement of $2000 on a surrender of that amount of stock by Bush, and the balance of the security was assigned to the appellants. Now here was a clear withdrawal of so much of the company's capital. The funds and assets of the corporation were diminished by the operation to the amount of $7000, and this $7000 formed a part of the capital. The security of the creditors of the corporation was lessened just so much. It is the very case to which the statute was intended to apply. The counsel of the appellants seeks to avoid the effect of this argument in two ways. He insists, in the first place, that if the contract was illegal, and the assignment therefore void, yet, as the company and the assignees were *in pari delicto*, the company cannot for that reason question the validity of the assignment, nor rescind the contract; so that the defendants would be perfectly protected in the payment to the complainants. And he seems to suppose that this is all that the defendants can require. It is by no means certain that the title of the appellants cannot be defeated. I admit that one party to an illegal contract, as a general rule, cannot set aside or rescind an illegal contract as against a *particeps criminis*. But what should hinder the stockholders or creditors of this defunct and perhaps insolvent corporation, from setting aside this contract and reclaiming this bond and mortgage? Most certainly, if our position is correct, that the effect of the assignment was to withdraw so much of the capital of the corporation, the appellants would not be protected by their assignment, against the claims of a receiver appointed on the application of the stockholders or creditors. (*Nathan* v. *Whitlock*, 9 *Paige*, 152.) The rule to which the counsel refers has no application to the present case. The ground of the objection is, that because the

assignment to the complainants in the present case was made in violation of law, it cannot be set up by them to support their title to the bond and mortgage. The rule is that, as between the parties to an illegal contract, the court will not aid either, in enforcing it, if not executed, nor allow either to rescind if executed. (2 *Pothier by Evans, App. No.* 1. *Holman v. Johnson, Cowp. Rep.* 343. *Perkins v. Sawyer,* 15 *Wend.* 412. *Nellis v. Clark,* 20 *Id.* 24. *Bolt v. Rogers,* 3 *Paige,* 154.) The parties are *in pari delicto,* and the court will not lend its aid to either. But the real question here is, whether the appellants, being parties to the original illegal contract, on which the assignment was predicated, can claim any thing under that assignment. They doubtless would, as against their assignor, be left in possession of the security; because the court would not interpose to set it aside for his benefit. But the assignees claim to set it up, and to make title to the bond and mortgage through it. Their right to sue in this court depends upon their showing a valid title to the bond and mortgage from the Globe Insurance Company. If the contract on which the assignment was predicated was unlawful, they have no valid title to the bond and mortgage. (*Bank of U. States v. Davis,* 2 *Hill,* 451, 458, *and the cases before cited.*) Judge Story states the rule upon the subject with much clearness, in a note to his work on Agency. (*Story on Agency,* 360.) Another ground taken by the appellants' counsel is that the defendants not having been parties to the original illegal contract cannot object to its illegality. It might be argued, if it was necessary so to do, that Bush was in fact a party to the illegal contract and *particeps criminis.* Because, from the evidence, it appears that the bond and mortgage was originally for $7000; that Bush surrendered $2000 of the stock, which he had never agreed to transfer, and which was endorsed as payment on the bond and mortgage, and the appellants surrendered the other $5000 which Bush had transferred to them; and upon this the assignment was made. Now this was all one transaction. It was all done at one time, and by a mutual agreement between the company, the appellants, and Bush. It will be seen, from

Johnson v. Bush.

this evidence, that Bush negotiated the transfer of the bond and mortgage, and was in fact a party to the contract. (*Story on Agency*, 356, § 347.) Again; a third party may object to an illegal contract. It is so in the case of usury; and there is no reason why it may not be done in every case of illegal agreements. (*Post* v. *Dart*, 8 *Paige*, 639.) I differ with the counsel when he says there is no analogy between cases of this kind and usurious contracts. I do not understand the object of usury laws to be the protection of the borrower alone. I had supposed that these laws were founded in public policy, and that for that reason courts would not enforce usurious contracts, even against third persons, unless it was shown that the usury had been waived by the borrower. In this last feature, usurious contracts differ from other illegal agreements. But whether this is so or not, the position before taken, that the appellants cannot recover without setting up and making title through the illegal contract, is a sufficient answer to the counsel's argument. In the case of *Bank of U. States* v. *Davis*, the party objecting to the illegal contract was not a party to the contract, and yet his right to make the defence was conceded.

The mortgaged premises, in this case, being of the separate property of Mrs. Bush, she stands in the relation of surety for her husband. There was a diversion of the mortgage from the object for which it was made and executed by Mrs. Bush, and the appellants cannot therefore have a decree except for a sale of the life estate of Bush. The testimony shows that the property mortgaged was the separate property of Mrs. Bush. It was a part of her inheritance from her father Isaac W. Stone. She was therefore a mere surety for her husband. (*Hawley* v. *Bradford*, 9 *Paige's Rep.* 200.) There was a diversion of the mortgage. The mortgage was given to enable Bush to procure stock from the Globe Fire Insurance Company, which was to be applied to the making of improvements upon her property. The stock was to have been issued to Bush. But instead of this being done, it was actually issued to the appellants, in satisfaction of a debt of the firm of Kempshall & Bush. The effect of the transaction was to make the mortgage pay a

Johnson *v.* Bush.

debt of Kempshall & Bush, instead of giving to Bush the possession of the stock. The rule on this subject is, that if by any agreement between the debtor and creditor, the situation of the surety is in any way changed, he is discharged. It is not necessary that the surety should show actual damage. It is sufficient that he may sustain damage. (2 *Ves. jun.* 540. 3 *Mad.* 226. 1 *Story's Eq.* 321. 10 *John.* 597. 7 *Paige*, 459, 614.) The object in obtaining the stock, as before remarked, was to enable Bush to improve the property of his wife. This the company well knew. Mrs. Bush had a right, therefore, to require that the stock should be issued to her husband, so that he might have the means of making the improvements. Her property would by that means be increased, and his life estate, in that event, might have been sufficient to pay the mortgage. Besides, if the stock had been issued to him, as between Mrs. Bush and the creditors of her husband, equity would have compelled the application of the stock to the making of the improvements, or failing in that, to the payment of the mortgage. In whatever aspect this case is viewed, Mrs. Bush has peculiar claims to the favorable consideration of a court of equity. In all the transactions of these parties her rights have been wholly disregarded. By a series of illegal acts her patrimony, which was pledged for a specific purpose, has, without her consent, been diverted to another; and if the appellants succeed in this suit, will be squandered in the payment of debts of an insolvent firm. If this could have been foreseen, or even suspected, her consent to such a pledge as she has given, would never have been obtained; and if there is any rule or principle of equity which can afford her relief, she is certainly entitled to it.

*Geo. Wood,* in reply. It is said the bond and mortgage are not valid, because the company is not a legally constituted corporation. It must be admitted, on all hands, that the company was organized under the charter, though its organization was defective in point of time. Assuming such defect to exist, the company did not in fact cease to exist as a corporation, but

Johnson *v*. Bush.

went on acting, performing business to a vast amount, in which great numbers of persons are involved.   According to the old fashioned rules of construction, it would be held, in such a case, that although it was the duty of the persons composing the company, to cease acting when they failed to become completely organized within the year, yet, inasmuch as they went on, completed their organization, and transacted business from year to year, as a corporation, they were *de facto* a corporation, under a colorable organization, and their various acts and transactions with the public would be sustained until the corporation should be dissolved on quo warranto.   This would be not only consistent with the rules of law, but would be a wholesome conservative course of procedure.   I might here rest the ase in regard to this point, were it not that prejudice against corporate institutions is the order of the day.   The second answer to this argument is, that the statute of 1838 continued the period for organization for another year.   It is said on the other hand, that it only continued the directors in office for another year.   Why continue them in office?   Why provide for opening the books once and oftener?   Can it be seriously pretended that the legislature meant that these books should be opened on public notice, once, or *oftener*, and all within the space of eighteen days?   The construction contended for does too much violence to the common sense of the legislature.   It is said the first charter did not authorize the appointment of a second time for opening the subscription books, and therefore the amended charter was necessary.   But as the first year had nearly run out, it was equally necessary to extend the time; and there can be no doubt in the mind of any person that the object of the legislature in continuing the directors, for the second year, was to give them a further time to complete their subscriptions and organization.   Powers and rights may be implied; and the implication in this case is fair and reasonable.   It is said in the next place, that the affidavit that the capital stock was actually paid or secured, called for by the 31st section of the statute, was a fraud upon the law, because it was not actually in good faith paid or secured.   It is not denied that the subscriptions

were *in fact* made, and the amount actually paid. or secured; what then is the objection? · Why that there was some understanding that the subscribers might get others to come in in their place; not men of straw, but good, efficient persons. I contend that there was nothing improper or illegal in this transaction. There was, in the first place, an actual subscription; liability, payment, and security. Such being the case, there could be no objection to their getting others to come in and step in their shoes, if the payments and securities were continued. Had the first subscription been fictitious, and not followed with an actual liability, there might have been some ground of objection to the regularity of the proceeding. A. attends a sheriff's sale; lands are struck off to him; he signs the articles pays the deposit, and complies in all things with the require ments of the law and the arrangements of the sale; but before the deed is given, B. steps in and assumes the purchase, pays the principal money, and takes the deed. Can it be pretended that this was not a valid sheriff's sale, whether B. came in under a previous or a subsequent understanding? If there had been a secret understanding that these directors subscribing were not to be liable at all, the affidavit would have been false, and a fraud upon the law; but that is not pretended. Assuming, however, that this substitution of a new bona fide subscription in the place of an antecedent subscription designed to be effected, was irregular, is it such an irregularity as would *ipso facto* annul the corporation? I think not. The affidavit was taken in good faith; there was a liability in the first subscription, and a *colorable* organization.

It is said, that supposing the subscriptions of Graham and others to be valid, the securities given by them became the securities of the corporation, and could not be withdrawn without violating some section of page 591 of the revised statutes, not named. I am aware of no section of the revised statutes which prohibits the withdrawing of the securities of a corporation and substituting others in their place, if the latter be good, where the thing is done in good faith, and without prejudice to the corporation. It is not alleged or proved that the substituted

securities were not good, or that they were designed in any way to injure or prejudice the corporation, as was the case in *Nathan* v. *Whitlock.* The counsel asks, what security have the public from making and filing the affidavit if the directors may the next day surrender up the securities and substitute others? To this I answer, their security is complete if the substitution is fair, just and equal; otherwise not. It turns upon that question. If the substituted securities are defective, inadequate, or false, it is a fraud upon the corporation or upon the stockholders and creditors; and the original subscribers will be held responsible. But it cannot be claimed that the substituted securities do not belong to the corporation. If, however, there be any irregularity in these proceedings, affecting the organization of the corporation, the remedy must be by quo warranto; especially after a long course of action under such organization, involving in the shape of contracts and otherwise, the rights and interests of thousands. It is also objected that the certificate of the acknowledging officer is not evidence of the complete execution of the assignment of the bond and mortgage, but that the resolution of the board of directors ought to have been produced and proved. The general principle is not disputed, that proof of the seal is evidence that it was correctly affixed. Before the provision of the revised statutes, an authority to affix the seal was just as essential as afterwards. The only difference is, that formerly the authority might be general; now it is specific. But the statute has not changed the rule of evidence. The seal is prima facie evidence of the authority to affix it to the deed; as before. This prima facie evidence formerly could be overcome by showing, either directly or circumstantially, that there was no authority, either general or specific, express or implied. Now it may be overcome by showing that there was no such resolution of the board. This satisfies the whole requirement of the statute. Such has been the practice under this act in proving and recording of conveyances, of corporations, and it would be productive of infinite mischief to give the statute a different construction. The resolution may be essential, but the mode of proof is not altered.

Johnson *v.* Bush.

The counsel thinks it is not sufficient in pleading to allege the execution of an instrument, but that the particulars should be set out. This would not be required even in a common law declaration. When the legislature intend to introduce a new rule of evidence, they express their intention in clear terms. The object of the statute is satisfied by leaving the seal to be prima facie evidence as before, to be overcome by counteracting proof in reference to the resolution of the board. It is next objected that this arrangement for delivering up stock to the corporation in consideration of the transfer, and on which arrangement the transfer was made, was illegal, and that the complainants therefore have not shown any title by virtue of the transfer to the bond and mortgage. We have a regular transfer, which is good *per se* to pass the title, and it must stand, unless it is impeached. They seek to impeach it on the other side. They do this by going behind the transfer and showing that the contract which induced it was illegal. But is that sufficient? To this we answer, that the illegal contract has been consummated. The parties are in *pari delicto;* and that a consummated illegal contract, in respect to which the parties are in *pari delicto*, cannot be impeached. Therefore you cannot impeach the transfer by thus going behind it, in such a contract so consummated. If A. should sell to B. a horse upon some illegal contract, of which A. had received the fruits, and the horse was actually delivered, and the whole consummated, the title of B. to the horse would be full and complete. A. enters into an illegal contract with B. to convey him a tract of land upon some consideration which is illegal, but which is actually received, and the land conveyed by a deed valid on its face, the title cannot be impeached by going back to the illegal contract, if that illegal contract be consummated, and the parties are in *pari delicto*. All this doctrine has been too long settled to admit of a question. Shall a third person then impeach the title? Clearly not. Suppose the land to be conveyed should be subject to a tenancy, the rent passing by the conveyance. Can the tenant, in a suit against him for the rent, impeach the title of the grantee, when the grantor himself cannot go behind

the conveyance to impeach it ?   The absurdity of allowing it would be too glaring.   Suppose the assignor should sell, he could show no title against his own assignment.   He could not impeach the transfer by going behind it to his illegal, consummated contract, in respect to which he is in *pari delicto.*   But it is said that all this doctrine cannot apply to contracts and transfers or conveyances by corporations, because a receiver may afterwards be appointed, the corporation may become insolvent, and such receiver representing such creditors can rip up such illegal contracts.   The corporation is the *entire* owner of the property.   All the right and interest therein centre in the body politic, both at law and in equity.   In suits in equity respecting mere pure equitable rights, as against third parties, the corporation represents the entire interest, and is the only party requisite to be brought before the court.   A contract between the corporation and an individual is consummated when fully performed by the parties, as fully as in the case of individuals.   All the rules and consequences applicable to and flowing from the consummation of illegal contracts between individuals are to be carried out and applied to such consummated contracts when made between a corporation and individuals.   It is no answer to say that stockholders or creditors or receivers may in certain cases come in and object to such contracts.   So in the case of individuals, the creditors of the individual may under certain circumstances come in and object, in courts of equity.   But the equity in all these cases is collateral and contingent.   It does not overturn the ordinary rule. If it did, it would be impossible to predicate consummation of any illegal contract.   They, (the creditors, receivers, &c.) may not think it advisable to object.   The contract may not be prejudicial to them.   Unless, and until they do interfere, the rule in regard to consummation applies to the case, if it is an illegal contract.   Suppose, in the case of such a consummated illegal contract between an individual and a corporation, the individual should seek in court to open it.   Could not the corporation avail itself of the point, and would it be any answer, on the other side, to say, why possibly you may become insolvent,

Johnson v. Bush.

may have creditors, or a receiver may be appointed, the contract may be prejudicial to them, and they may seek relief? Clearly not. Such intervention is an exception to the ordinary rule, which is, that the body politic represents the entire legal and equitable interest; and if the individual would avail himself of the possibility of that objection he should bring him before the court.

The last point to be considered is, that the property upon which this mortgage was given belonged to Mrs. Bush, the wife, and that therefore, in respect to it she was surety for her husband. Be it so. Then she would have a right to come upon her husband's estate for indemnity. That is all. The cases go no further. If she was surety, and her husband the principal debtor, it of course follows, that the property obtained, and on account of which the mortgage was given, belonged to the husband; otherwise she could not have been his surety in respect to the debt. If it belonged to him he could of course dispose of it as he pleased, and might apply it as he pleased, and could pay off his honest debts with it. The counsel, the next moment, flies from this position of suretiship and maintains that the stock was obtained for the purpose of being applied to the improvement of this very land on which the mortgage rested. If so, then the stock itself for which this mortgage was given, must beneficially have belonged to the wife. If this was the case, how could the wife be the surety in the debt contracted in procuring that stock? The counsel has left this inconsistency unexplained. His argument is not only inconsistent, but his position is untrue in fact. It is not true there was any arrangement between the husband and wife that this stock should be applied in improvements upon the property. There was only a communication, and a very indirect one, of an intention on his part to apply it to that purpose. This is altogether different from any agreement between him and his wife that it should be so applied. Such an agreement, to have been of any effect, should have been in writing, and should have preceded the giving of the mortgage. But it stands without a particle of evidence to support it, and

·of course without a particle of evidence of any knowledge ·thereof by the corporation, or its officers, or of the complainants, the assignees.

THE CHANCELLOR. The first objection made by the defendants to the complainants' right to a decree of foreclosure, in this case, is that the bond and mortgage are void, because the Globe Fire Insurance Company, to whom they were given, was not a legally constituted corporation; inasmuch as it did not organize and commence its business within one year from the date of its incorporation. The seventh section of the title of the revised statutes relative to the general powers, privileges and liabilities of corporations, (1 *R. S.* 600,) declares that if any corporation created by the legislature shall not organize and commence the transaction of its business within one year from the date of its incorporation, its corporate powers shall cease. The date of the incorporation, under this provision of the revised statutes, refers to the time when the act creating the corporation takes effect as a law; which, in this case, was on the twentieth day after the act of incorporation was approved by the governor. (1 *R. S.* 157, § 12.) And if the year for the commencement of the business of this corporation is to be limited by the date of its original incorporation, and without any extension, its powers ceased on the 22d of May, 1838; as its stock was not all subscribed for and taken until ten months after that time. I think, however, the fair construction of the act of the 14th of April, 1838, amending the original act of incorporation, is that it extended the time for the organization and for the commencement of business; although the act does not in terms extend the time for the commencement of the business of the company. That act took effect as a law on the 4th of May, 1838, only eighteen days before the expiration of the year from the time of the original incorporation of the company. It continued the directors named in the original act of incorporation in office one year from the time when their offices were to expire by such original act. It authorized the subscription books for stock to be again opened, from time to

. time, upon one week's notice on each occasion. It is wholly improbable, therefore, that the legislature expected or intended that the company should complete its organization, and commence its business, within the short space of eighteen days. And the fair construction of the amendatory act is that the company was to have one year from the time when that act took effect as a law, to complete the organization of the company and commence its business.

If the last $160,000 of the stock of the company which was subscribed for by the Grahams and others, was subscribed for in good faith, with an intention on the part of the directors of the company that the subscribers should keep it and pay for it, unless it should be taken off their hands and paid for or fairly secured by others, the company was duly organized, within the time allowed by law for that purpose. And upon the evidence in this case, the vice chancellor came to a correct conclusion that the subscription for this $160,000 of the stock of the company was legal. The corporation, therefore, was in existence and competent to take this bond and mortgage when it was delivered to the company in payment or security for the seventy shares of the stock of the company. And the bond and mortgage were valid securities, in the hands of the corporation, for the whole amount of $7000, for which they were given to and accepted by the company; and as such, they formed a part of its capital stock.

Although the securities given for the $160,000, subscribed by the Grahams and others, were a part of the capital of the company, and could not be withdrawn so as to reduce the capital, without authority of the legislature, or by a proceeding under the article of the revised statutes relative to the voluntary dissolution of incorporations, the directors of the company had full power to allow other good and sufficient securities to be taken as a substitute for that part of the capital stock of the company.

. The objection that the assignment to the complainants was without a previous resolution of the board of directors, authorizing it, would probably be well taken if that fact had been

Johnson *v.* Bush.

properly brought before the court. But the proof, by the sub-scribing witness to the assignment, before the commissioner, that the seal was affixed to such assignment by authority of the corporation, appears to be prima facie evidence that the assign-ment had been authorized by the board of directors. For in no other way could the corporation authorize an assignment of its property, or effects, to an amount exceeding one thousand dollars, out of the usual course of its business. As the secre-tary was examined as a witness in the cause, it was incumbent upon the defendants, if they wished to rebut this prima facie evidence of authority to make the assignment, to inquire into the fact; and not to surprise the other party with an objection of this kind after the proofs in the cause had been closed. The vice chancellor is under a mistake in supposing that the assignment was executed by the secretary, as well as the presi-dent of the company. Upon its face, the assignment states that the corporation has caused its seal to be affixed, and the assignment to be signed, by the president of the company; and the execution of the instrument to be attested by the secretary. The latter, therefore, is not the officer of the company who executed the assignment, by affixing the seal to the same; nor does he, as the vice chancellor supposed in his opinion, swear before the commissioner that he affixed the seal to the assign-ment. He is merely an attesting witness to the deed, who proves its execution before the proper officer; to authorize it to be recorded, and to be given in evidence without further proof, under the provisions of the revised statutes on that subject. The fact that the corporate seal was properly affixed to an instrument which required an express authorization for that purpose, and where the mere circumstance that the person affixing it was in-trusted with the custody of its seal was not even prima facie evi-dence of his right to affix it to the particular instrument in ques-tion, was a fact which it was necessary to establish before the officer who took the proof of the execution of such instrument, to authorize it to be recorded. For, without such proof, the mere evidence that the seal was affixed by an officer of the corpo-ration intrusted with the custody of its seal, would not be

Johnson v. Bush.

sufficient to establish the due execution of this particular instrument. What the secretary of the company, who witnessed the execution of the instrument, testified to on the subject, before the commissioner, appears to have been proper evidence. And if the assignment was duly authenticated for the purpose of authorizing it to be recorded, I think it could properly be received in evidence without further proof; subject however to the right of the adverse party to show that it was not executed by the corporation, because no resolution of the directors had authorized the person intrusted with the corporate seal to affix it to such an assignment. The law is otherwise where a deed is executed by attorney. For the acknowledgment or proof of the execution of the deed by the attorney is all that is necessary to be established, by the recording acts, to entitle it to be recorded. The power of attorney under which the attorney acts is a separate and distinct instrument, which must not only be under the seal of his principal, but must itself be duly proved by the subscribing witness thereto, or acknowledged by the person executing the same, to entitle it to be recorded.

The remaining question to be considered is whether the corporation had the legal power to take a surrender of a part of its capital stock; not for the purpose of issuing new scrip therefor to other persons upon being paid or secured the amount of the same from them, but as an extinguishment of a part of the capital of the company, and to give up the property or effects of the company in exchange for the same. Upon a careful examination of the provisions of the revised statutes upon that subject, I think the vice chancellor arrived at the correct conclusion that the corporation had no such power. The assignment of the bond and mortgage, upon the surrender of the fifty shares of stock held by the complainants, as well as the endorsement of the $2000 in consideration of the surrender of the other twenty shares of stock, for the security of the par value of which stock this bond and mortgage was also held by the company, was unauthorized. And being in direct violation of the statutory provision on that subject, the complainants acquired no legal or equitable right to the bond and mortgage by the

Johnson *v.* Bush.

assignment. The bond and mortgage therefore belong to the corporation as a part of the securities in which its capital stock is invested ; and may be enforced against the mortgaged premises for the whole $7,000 for which they were originally given, with interest thereon from the time to which interest had been paid previous to the assignment. And the corporation having no power to purchase its capital stock, or to take a surrender thereof for such a purpose, the complainants, as the owners of the fifty shares of the stock illegally surrendered, must seek their remedy, if they have any, through the medium of such stock, and by having the concerns of the company closed by the appointment of a receiver. The revised statutes declare that it shall not be lawful for the directors of any moneyed corporation to divide, withdraw, or in any manner pay to the stockholders, or any of them, any part of the capital stock of the corporation, without the consent of the legislature. (1 *R. S.* 589, § 1, *sub.* 2.) The endorsement of the $2000 on this bond and mortgage, upon the surrender of the twenty shares of stock owned by Bush, and the assignment of the residue of the debt to the complainants upon the surrender of the fifty shares of stock held by them, were both in direct violation of this plain and explicit prohibition of the statute. The complainants not only had notice of this violation of the statute by the officers of the corporation, but were themselves participators in the illegal act. And it would be inconsistent with every principle of justice for this court to aid them in the enforcement, not of a right acquired by a violation of the law, but of a claim of right which the legislature clearly intended they never should acquire in this way.

If there are any creditors, or any stockholders, who have not participated in this violation of the laws of the state which were binding on the corporation, they may apply for the appointment of a receiver, to collect in the debts of the corporation and distribute its effects among the stockholders according to their several rights and interests. (2 *R. S.* 464, § 39.) And if there are none such to apply, the receiver may be appointed upon the application of the attorney general. So that this bond and

mortgage need not be lost to those who are equitably entitled to the moneys due thereon ; even if the directors of the compa-ny should fail to collect the amount. But as no legal or equitable title to the bond and mortgage was acquired by the complainants, through this illegal transaction, which a court of justice will enforce upon their application, the decree of the vice chancellor was right. It must therefore be affirmed, with costs.