Gillet, receiver of the St. Lawrence Bank, *vs.* Moody.

Where a banking association formed under the general law, being insolvent, transferred to one of its directors certain Arkansas bonds in exchange for shares of its own stock, *held*, on bill filed by the receiver of the bank subsequently appointed, that the transaction was illegal and void under the statute (1 *R. S.* 589) " to prevent the insolvency of moneyed corporations and to secure the rights of creditors," and that the receiver might reclaim the bonds for the benefit of creditors.

*Also held*, that the transaction was void as to creditors upon general principles and irrespective of the statutory prohibition.

Banking associations organized under the general law are moneyed corporations, and as such are within the statute above mentioned.

It seems that a bank formed under the general law, although it has no board of directors, is nevertheless within those provisions of that statute which declare it to be unlawful for the " *directors*" of any moneyed corporation to do certain prohibited acts.

The intention of the statute, it seems, was to prohibit the acts specified therein, whether done by directors or by any other instrumentality.

The receiver of an insolvent corporation represents both the creditors and stockholders, and may assert their rights when affected by the fraudulent or illegal acts of the institution.

The St. Lawrence Bank was organized in the year 1838, under the general banking law of that year, and commenced business early in 1839, at Ogdensburgh, in the county of St. Lawrence. In the winter of 1841-2, the bank commissioners filed a bill and obtained an injunction against the institution. In February, 1843, Mr. Gillet was appointed receiver of the effects of the banks by an order of the chancellor made in that suit, and in October of the same year, he filed the bill in this cause for the purpose of annulling an agreement made between the directors and the defendant, in February, 1842, in pursuance of which the defendant received from the bank, certain bonds of the state of Arkansas, and for the purpose of reclaiming those bonds. The cause was heard on pleadings and proofs before the assistant vice chancellor of the first circuit, who in April, 1847, dismissed the bill with costs. His decree was affirmed by the supreme court, (*see* 5 *Barb.* 185,) and the complain-

ant appealed to this court. The facts are sufficiently stated in the opinion of BRONSON, Ch. J.

*S. Beardsley*, for appellant. The bank was insolvent when the transfer of the Arkansas bonds was made. (*Bayly* v. *Scho-field*, 1 *M. & S.* 338; *Williams on Per. Prop.* 126; *De Tastet* v. *Le Tavernier*, 1 *Keen*, 161; *Herrick* v. *Borst*, 4 *Hill*, 652; 3 *Stark. Ev. 7th Am. ed. pt.* 1, *p.* 173, *note; id. pt.* 2, *p.* 1444; 2 *Sug. on Vend.* 6th *Am. ed.* 318; *Biddlecomb* v. *Bond*, 4 *A. & E.* 332; *Shears* v. *Rogers*, 3 *B. & Adol.* 362; *Shone* v. *Lucas*, 3 *D. & R.* 218.) That the property of a debtor, except such as may be exempt from legal process, should be applied to the payment of his debts, is a principle equally applicable to artificial and natural persons. When a corporation, therefore, becomes insolvent, its whole property, if needed for that purpose, should be applied to satisfy its creditors; and until they are paid in full, no stockholder, as such, has any claim, nor can he be allowed to share in such property. (2 *Story's Eq. Juris.* § 1252; *Wood* v. *Dummer*, 3 *Mason*, 308; *Scott* v. *The Eagle Fire Co.* 7 *Paige*, 198; *Nathan* v. *Whitlock*, 9 *id.* 152; *Morgan* v. *The New-York & Albany Railroad Co.* 10 *id.* 290; 5 *Ohio*, 164; *Johnson* v. *Bush*, 3 *Barb. Ch.* 207.) The receiver represents the rights and interests of the creditors and stockholders of the bank. (2 *R. S.* 469, § 67; 464, § 41.) Banking institutions formed under the general bank law, are not only corporations in the strict sense of that term, but they are moneyed corporations, and as such are subject to most, if not all of the provisions of the revised statutes in respect to that class of corporations. (*The Supervisors of Niagara* v. *The People*, 7 *Hill*, 504; *Gifford* v. *Livingston*, 2 *Denio*, 380; 1 *R. S.* 598, §§ 51, 52; *id.* 414, *tit.* 4; *id.* 589, *Art.* 1; *Gillett* v. *Campbell*, 1 *Denio*, 523; *Sagory* v. *Dubois*, 3 *Sand. Ch. R.* 485; *The People* v. *The Assessors of Watertown*, 1 *Hill*, 607; *Leavitt* v. *Tylee*, 1 *Sand. Ch. R.* 207; 2 *R. S.* 463, §§ 39, 42; *Boisgerard* v. *The N. Y. Bank. Co.* 2 *Sand. Ch. R.* 23.) The transfer of these Arkansas bonds to the defendant, a stockholder and director of this insolvent bank, was, therefore, not only illegal

Gillet *v.* Moody.

on general principles, but was in violation of the express provisions of the revised statutes. (1 *R. S.* 589, § 1, *sub.* 2, 5; *id.* 603, § 4; *id.* 591, § 9; *Johnson* v. *Bush,* 3 *Barb. Ch. R.* 207; *Bowen* v. *Lease,* 5 *Hill,* 221.)

*J. Rhoades,* for respondent.

BRONSON, Ch. J.   The bank was in a sickly condition early in the year 1841, and was only kept up by pledges of the individual credit of the directors to raise funds.   In March of that year, the agents of the bank in Albany ceased for several weeks to redeem its circulating notes; and on the third day of December following, the bank formally suspended specie payments, and never afterwards transacted any regular banking business. On the same day all the funds of the bank were assigned to Egbert N. Fairchild, the cashier, to secure and indemnify the directors against the personal liability which they had previously incurred in raising money to carry on the business of the bank.   At this time some of the directors hoped, and probably believed, that the bank was not irretrievably insolvent, and that they should be able to make such arrangements as would set the institution again in motion.   But they were mistaken. Stopping payment is of itself sufficient evidence of the insolvency of a bank, within the principle of the cases cited at the bar ; and when, as in this case, there is nothing to rebut the presumption, the evidence of insolvency is conclusive.   There is, however, other proof beyond that of stopping payment; and clearly this must be regarded as a broken bank on the third of December, 1841.

The defendant was an original stockholder to the amount of five thousand dollars, and was one of the directors of the bank from the time it commenced business in 1839, until after the transaction of which the receiver complains.   He gave the bank his bond and mortgage for the amount of his stock, payable in October, 1843, with semi-annual interest.   On the 23d of December, 1841, he made an agreement with the directors to take up his bond and mortgage by paying the amount, at the end of

six weeks, in the circulating notes of the bank, which were then at a large discount; and the agreement was subsequently carried into execution. The receiver does not complain of this transaction.

On the 24th of February, 1842, the board of directors—the defendant being present and acting as one of the number—agreed to purchase the defendant's stock in the bank, amounting to five thousand dollars, and pay him for the same an equal amount in Arkansas bonds, which were then worth about eighteen cents on the dollar of their par value. The bill was filed to set aside this transaction; and I do not see how it can be supported. Creditors are entitled to a preference over stockholders in distributing the effects of an insolvent corporation. The principle is so obviously just, that I shall spend no time in attempting to prove it.

But it is said that the agreement to purchase the defendant s stock was part of the arrangement made in December for paying the bond and mortgage—the entire contract being, that if the defendant would pay the mortgage, which was not then due, and surrender his stock, the bank would give him five thousand dollars in Arkansas bonds. Although there is some evidence going to support this view of the case, it does not, in my judgment, establish the fact that the agreement for the payment of the mortgage, and that for the purchase of the defendant's stock, were both made at the same time. So far as the written evidence goes, they were separate and distinct transactions, with a period of two months between them. It is true that the resolution of the 24th of February speaks of purchasing the stock "as agreed by the board of directors with Mr. Moody on the 23d of December, 1841;" but this is not very high evidence that there was such an agreement at that time. There may have been some conversation on the subject prior to the resolution of the 23d of December; but if the parties had come to an agreement—if there was one entire contract, as is now alledged, for the payment of the mortgage and the purchase of the stock, it is strange that half, and only half of the agreement, should have been reduced to writing at the time, while there was no

written evidence of the other half until another resolution was passed two months afterwards.

Some of the witnesses speak of a general understanding or agreement among the directors of the bank, that any stockholder who would pay up his bond and mortgage and surrender his stock should receive from the bank state stocks to the amount of the stock surrendered; but they leave it doubtful when the directors came to this conclusion; and their resolution to that effect was not passed until the 4th of March, 1842, eight days after the arrangement with the defendant, in both its branches, had been completed.

I am not satisfied that the fact on which the main argument for the defence is founded has been made out by the proofs; but as there is some evidence tending to the conclusion that the defendant paid the mortgage in the expectation of receiving the Arkansas bonds on surrendering his stock, I will now assume that such was the agreement of the parties. How does the case then stand? The defendant paid the mortgage before it became due; but for anticipating the day of payment, he had what must be deemed a full legal equivalent in stopping the interest, which was payable semi-annually. But he saved, moreover, from a quarter to one half the amount of the debt by paying in the bills of the bank at their par value, when they were at a discount at from twenty-five to fifty per centum in the market. It is impossible, therefore, to regard the payment of the mortgage as a valuable consideration to the bank for the other branch of the agreement. The stock which the defend ant surrendered was worthless, so that he neither lost, nor did the bank gain any thing by the surrender. It follows that the Arkansas bonds which the defendant got from the bank, and which were then worth about nine hundred dollars, were, in effect, a mere gift of so much money to the defendant; and that too, when he was one of the directors, and bound as a faithful trustee to protect the property for the creditors of the corporation. It would be difficult to defend such a transaction.

The only possible answer to this view of the matter is, that the directors thought the bank was not so utterly ruined but

that it might be again set in motion, if those who had given mortgages for stock could be induced to pay their debts at once, instead of waiting until the stipulated term of credit had expired; and in that belief made very liberal offers to the mortgagors for the purpose of accomplishing the object. I do not doubt that the officers of a bank may properly make sacrifices of the corporate property for the purpose of passing a crisis in the affairs of the institution. But such an act can only be justified when the object is to protect the rights of creditors, and do equal justice to all the stockholders of the corporation. It must not be an act for the exclusive benefit of a particular individual, especially if he be one who has been intrusted with the management of the funds of the institution. Now in this case, paying off the defendant's mortgage was but a drop in the bucket towards what was necessary to set the bank in motion; and there does not appear to have been any resolution of the board offering similar terms to the other stockholders until the 4th of March, 1842, more than two months after the case of the defendant had been specially provided for by the board. There is evidence of a general understanding among the directors, that inducements of a like nature should be offered to all of the stockholders to pay up their mortgages; but there is great difficulty in believing that the directors had come to a final conclusion on the subject as early as the 23d of December, 1841; for if they had, there would probably have been a general resolution of the board, providing alike for all the stockholders, instead of providing specially for the case of the defendant, and for no one else. And it must be added, that when the board, two months afterwards, offered state stocks to all who would pay up their mortgages and surrender their bank stock, the resolution did not give the other stockholders the privilege which had been accorded to the defendant, of paying their mortgages in the depreciated bills of the bank. The case of the defendant seems to stand alone; and I think he, as a director, was not at liberty to make such a bargain with himself as an individual; nor were the other directors at liberty to make such a bargain with one of their associates. Although there may have been no act-

ual intention to do a wrong, still if the transaction is allowed to stand, it will operate as a fraud upon the creditors, or—if by any possibility the fund should prove more than sufficient to satisfy them—upon the other stockholders of the bank.

.But if the purchase of the defendant's stock with the funds of the bank could be justified at the common law, the act was, I think, expressly forbidden by .the statute "to prevent the insolvency of moneyed corporations, and to secure the rights of their creditors and stockholders." The words are—"it shall not be lawful for the directors of any moneyed corporation—to divide, withdraw, or in any manner pay to the stockholders, or any of them, any part of the capital stock of the corporation ; or to reduce such capital stock, without the consent of the legislature ;" or " to apply any portion of the funds of their corporation, except surplus profits, directly or indirectly, to the purchase of shares of its own stock." (1 *R. S.* 589, § 1.) The case falls so plainly within these prohibitions that no question is made on the subject, if the statute applies to associations under the general banking law—the St. Lawrence bank having been organized under that law. That these associations are corporations, and " moneyed corporations," has been directly and expressly adjudged by the highest courts in the state. They are not corporations in a qualified sense, as *within the intent and meaning of some particular statute ;* but are corporations to all intents and purposes. If any thing can be settled by judicial decisions, this is settled. ( *The People* v. *Assessors of Watertown,* 1 *Hill,* 616 ; *Willoughby* v. *Comstock,* 3 *id.* 389 ; *The People* v. *Supervisors of Niagara,* 4 *id.* 20, and *S. C. in error,* 7 *id.* 504 ; *Leavitt* v. *Tylee,* 1 *Sandf. Ch.* 209 ; *Boisgerard* v. *New-York Banking Co.,* 2 *id.* 23 ; *Sagory* v. *Dubois,* 3 *id.* 466, 485 *And see Gifford* v. *Livingston,* 2 *Denio,* 380 ; *DeBow* v. *The People,* 1 *id.* 9.) There was a difference of opinion between the supreme court and the court of errors on the question whether the constitution applied to the free banks—the supreme court holding that it was applicable alike to all corporations, while the court of errors thought it applied only to corporations created by special charter, and not to those formed under gene-

ral laws. But both courts were agreed, that the free banks are corporations. If there was room for a doubt on this point after the decision of the court of errors in *Warner* v. *Beers*, (23 *Wend.* 103,) the decision of the same court in *The Supervisors of Niagara* v. *The People*, (7 *Hill*, 504,) removed all ground for such a doubt. And yet I notice that some of the free banks still keep up a practice which was adopted when it was thought necessary to use some such device to get round the constitution, and add the name of the president to the corporate name of the institution in bringing suits. It was long since held that this was unnecessary, and that the free banks might sue and be sued in the same corporate name which is used in transacting their other business; (*The People* v. *The Assessors of Watertown*, 1 *Hill*, 621;) and as it is now settled that the free banks have a legal existence, it may be hoped that the inconvenient practice of using the name of the president in bringing suits by and against the corporation will be given up.

But as the statute makes it unlawful for "the *directors* of any moneyed corporation" to divide capital, purchase stock, &c. and the free banks are not required by law to have directors, it is insisted that those banks are not within the prohibition, although, as in this case, they may in fact have a board of directors. It was held in the *Matter of the Bank of Dansville*, (6 *Hill*, 370,) that the statute giving the supreme court summary jurisdiction over the election of directors of moneyed corporations did not apply to the free banks. But the decision went upon special grounds, which are not applicable to the case under consideration. *Gillet* v. *Campbell*, (1 *Denio*, 520,) is more like this case. It was there held, that an assignment by the president and cashier of a part of the effects of a free bank, ex ceeding one thousand dollars in value, to secure a debt due from the bank, did not come within the eighth section of the statute to prevent the insolvency of moneyed corporations; and that the assignment was valid, although it had not been authorized by a previous resolution of the board of directors. Although I delivered the opinion of the court in that case, I do not feel entirely certain that the decision stands on a firm foundation.

But it is enough for the present to say, that there is a plain distinction between the two cases. In *Gillet* v. *Campbell* there was nothing to show that the directors had any power to authorize the assignment, or to pass any resolution whatever on the subject; while here, the very act complained of was done by the directors: they purchased the defendant's stock, and paid for it with the funds of the bank; and it has not been denied that they had authority to do the act, if it was not forbidden by the statute. The case comes, in every particular, within the express words of the prohibition. This is a moneyed corporation; it has directors; and they have applied the funds of the institution to a forbidden object.

The case is not only within the letter, but it is, if possible, still more plainly within the policy of the statute. The object of the legislature, as appears from the title of the act, was "to prevent the insolvency of moneyed corporations, and to secure the rights of their creditors and stockholders." The section in question was made for the special purpose of securing the capital stock to the creditors of the company, instead of allowing it to be divided among the stockholders; and no reason can be assigned why the prohibition should not extend to the free banks, as well as to all other moneyed corporations.

This is a beneficial statute, and it should not be defeated by a narrow construction. Although this case falls within the letter, as the illegal act was done by the directors, I do not doubt that the act would have been equally void if there had been no directors, and the purchase of the defendant's stock had been made by any other officer or agent of the bank, having control of its funds. The legislature has declared, that the term "directors," as used in this statute, "shall be construed to embrace all persons having by law the direction or management of the affairs of any such corporation, by whatever name they may be described in its charter, or known in law." (§ 53.) The evident intention was, to prohibit a division of the capital, or any portion of it, among the stockholders, by whatever instrumentality the powers of the corporation in doing the act might be exerted.

Every director who violates any provision of this statute is

made personally liable to the creditors and stockholders respec-
tively of the corporation, to the full extent of any loss they
may respectively sustain from such violation. (§ 10.)    The
defendant was a director, and he was present as a member of
the board when the resolution was passed to give him Arkansas
bonds for his stock.   He, as a director, has violated one of the
provisions of the statute ; and I see no good reason why the re-
ceiver has not taken the proper course to charge him personally,
by annulling the transaction, and compelling a restoration of
the bonds.   In this way the funds which have been illegally
diverted, will be secured to the creditors ; and if there should
be more than enough to satisfy them—of which there is little
probability—the balance will be distributed equally among all
the stockholders.   The receiver stands as the representative of
both creditors and stockholders.

But if the receiver has not taken the most appropriate reme-
dy in reference to the 10th section of the statute ; and should it
also be conceded that the act would not have been void if the
funds of the bank had been improperly used in purchasing the
stock of one who was not a director, still as the defendant was
a director, and one of the board which ordered this illegal trans-
action, I can not think that he got a good title to the bonds as
against the creditors and stockholders of the bank, who are
represented in this action by the receiver ; and if the 10th sec-
tion does not help, it does not stand, in the way of the remedy
which the receiver has taken.

I am of opinion that the decrees of the courts below are
erroneous and should be reversed, and that a decree should be
entered in accordance with the prayer of the bill, with costs to
the complainant in the courts below.

Decree accordingly.