corporation is not a party to this agreement, and has never formally adopted it, or become bound by it. The plaintiff brings this action to reform the books of the corporation, because, as he alleges, Harris has fraudulently and unjustifiably altered the books of the corporation, so as to depreciate the book value of the stock on the books of the corporation, and he asks that the court should in this action compel the corporation to change the entries in its books, so as to show that the stock has a greater value than is now shown on the books.

I do not see that this corporation, which is not a party to the agreement, can be compelled to alter its books so as to show that it has a greater capital invested in the business than the books now show, in order to enable the plaintiff to compel the defendant Harris to pay a greater sum of money for his stock in the event that he would be entitled to compel Harris to purchase it. There is no attempt to reform the agreement under which the plaintiff has acquired whatever right he has against Harris; but the court is asked, if it determines that certain entries in the books of the corporation do not correctly describe the assets of the corporation or their value, to modify the books so as to express what the court should think from the evidence would be the correct market value of the property of the corporation. I know of no right that a court of equity has to thus interfere with the books of a going corporation because two of its stockholders have made an agreement by which one is to acquire certain rights, dependent upon what is shown on the books, and I therefore think that the complaint states no cause of action.

---

(79 Misc. Rep. 483.)

SCANLON v. NEW YORK CENT. & H. R. R. CO.

(Supreme Court, Special Term for Motions, Onondaga County. December 7, 1912.)

1. JUDGMENT (§ 145*)—DEFAULTS—VACATION.

In an action by an administratrix for damages for the death of her intestate, an engineer, killed in a derailment, verdict for plaintiff was set aside as against the weight of the evidence, and thereafter, defendant's attorneys ascertaining that the testimony on which the verdict was based was perjured, plaintiff's counsel consented to a default and dismissal. Subsequently, at a time when the statute of limitations had barred a new action, plaintiff, appearing by another attorney, sought a vacation of the default and order of dismissal, on the ground that the perjured testimony had been secured without her knowledge and consent, and desired to proceed on a different theory of liability. Held, while justice demands that a party have a right to fairly present the issues of his case, yet, as the perjured testimony might well have resulted in a binding verdict for plaintiff and had been procured by her agent, the default would not be vacated; it being apparent that the new theory would not have been developed, had not defendant's counsel discovered the perjury.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 271, 292–295; Dec. Dig. § 145.*]

2. JUDGMENT (§ 145*)—INJURIES TO SERVANT—ACTIONS—EVIDENCE.

Upon motion by the administratrix of a railroad engineer, killed in a derailment, to set aside a default and allow her to proceed on a new

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

theory, the evidence submitted *held* in all its aspects to show contributory negligence on the part of the engineer, thus precluding granting of the motion.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 271, 292–295; Dec. Dig. § 145.*]

3. MASTER AND SERVANT (§ 244*)—INJURIES TO SERVANT—CONTRIBUTORY NEGLIGENCE.

Where a railroad engineer, after passing a warning signal on a semaphore, does not attempt to check the speed of his train, which is going at the rate of 75 miles an hour, until he is more than half the distance to a cross-over, he is guilty of contributory negligence, barring recovery for his death.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 776, 777; Cent. Dig. § 244.*]

Action by Elizabeth T. Scanlon, as administratrix of the estate of John Scanlon, deceased, against the New York Central & Hudson River Railroad Company. On motion of plaintiff to vacate and set aside the dismissal of the complaint and for the opening of plaintiff's default. Motion denied.

Hancock & Spriggs, of Syracuse, for plaintiff.
Hiscock, Doheny, Williams & Cowie, of Syracuse, for defendant.

MERRILL, J. This is a motion made by the plaintiff, Elizabeth T. Scanlon, as administratrix, to vacate and set aside the dismissal of the complaint herein and opening plaintiff's default. The facts are briefly as follows:

Plaintiff's intestate, John Scanlon, was killed January 25, 1910, at about 5 o'clock in the morning, as he was engaged in running a train for the defendant, known as the Twentieth Century Limited, at a point near St. Johnsville, N. Y., a few miles east of Little Falls. The plaintiff was duly appointed administratrix of the estate of decedent, and shortly after his death brought this action to recover damages under the statute from the defendant company, upon the allegation that the death of her intestate was caused by the defendant's negligence. The action was brought in plaintiff's behalf by the law firm of White, Cheney, Shinaman & O'Neill, of Syracuse, N. Y., and was brought to trial at the June, 1910, Trial Term of Supreme Court held by Mr. Justice De Angelis at Syracuse. The trial resulted in a verdict for the plaintiff of $15,000.

The train in question was proceeding easterly upon track No. 1 and the accident occurred in making a cross-over to track No. 4 at St. Johnsville aforesaid. On the occasion in question the train was proceeding easterly at a very high rate of speed, probably at the rate of 75 miles per hour. Admittedly the speed was so great that the cross-over could not be taken unless the train's speed was slackened to at least 20 miles per hour. The defendant company, for the purpose of governing the operation of its trains and advising the engineers in charge thereof that the cross-over at St. Johnsville was set, maintained a system of signals by means of a semaphore known as the "distant signal," which was located 3,055 feet westerly from the cross-over itself.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Upon the trial of the action the alleged negligence for which the plaintiff complained was the failure of the defendant company to give to plaintiff's intestate a correct signal. It is conceded that plaintiff's intestate, as he approached the distant signal in question, should have had displayed a yellow or caution signal in case the track upon which he was proceeding was in any manner obstructed, or in case he was compelled to make the cross-over. It was the contention of the plaintiff that on the morning in question the semaphore signal, as displayed to the plaintiff's intestate, showed a clear track, and that therefore plaintiff's intestate was not negligent in failing to slacken the speed of his train or bring the same under control as it approached the cross-over in question, which had been set so as to take his train to Track 4.

The only testimony upon the trial supporting plaintiff's contention was furnished by one Howard Dingman, who testified in substance that on the morning in question he was at or near the semaphore at the time or shortly after the Twentieth Century Limited passed, and that the semaphore signal showed an open or clear track on track No. 1, and that the caution signal was not set. It would appear that the testimony of Dingman was somewhat unsatisfactory, and that he was contradicted by several witnesses, mostly employés, produced by the defendant. The trial judge, upon the rendition of the verdict, set the same aside as against the weight of evidence.

Soon thereafter counsel for the defendant instituted an investigation of the witness Dingman, and through its special agent of the claim department obtained from Dingman a confession that the testimony which he had given upon the trial, and which the jury evidently credited, was perjured, and that he was induced for a consideration paid to him to go upon the witness stand and give testimony upon the trial which was untrue. This confession was followed by an examination conducted by one of defendant's attorneys at the courthouse in the city of Utica, N. Y., when Dingman was further examined and his deposition taken by a stenographer. Dingman upon this examination admitted that he had been approached by one Joe Michaels, claiming to be working in the interest of the plaintiff, and who plied him with whisky and induced him to go to the office of plaintiff's attorneys, and that said Michaels then dictated to one of plaintiff's attorneys a statement of facts to which he claimed Dingman would testify, and which embodied the story that the latter had observed the semaphore in question, and that it did not indicate caution, but an open track, to the wrecked train on the morning in question. Dingman further swears in his deposition, in answer to questions put to him, that the testimony which he rendered upon the trial was perjured, that he did not see the semaphore as he had testified, and that for his services he was paid a consideration of $200. In making his deposition, Dingman says that he thinks Michaels fooled plaintiff's attorneys, and it would appear that Michaels was the culpable party who induced Dingman to testify. The deposition was taken before the stenographer at Utica on October 9, 1910.

The case was noticed for retrial at the November, 1910, Trial Term, held at the city of Syracuse, N. Y. Shortly before the case was reached upon the day calendar, the attorneys for the defendant in-

formed counsel for the plaintiff of their action, and that they had obtained from Dingman confession of his having committed perjury upon the previous trial. Upon being so informed, plaintiff's counsel, who had had charge of the previous trial, informed the plaintiff, the attorneys for the defendant, and the court that he would not appear further in the case in behalf of the plaintiff, that the theory upon which she had proceeded was the only one upon which she could recover, and, that having been shown to have been sustained by perjured testimony, that, so far as he was concerned, the case must end. When the cause was reached upon the day calendar, upon motion of defendant's attorneys, and Frank J. O'Neill, Esq., of the firm of White, Cheney, Shinaman & O'Neill, attorneys for the plaintiff, appearing for said plaintiff and not objecting to said motion, the case was dismissed, and an order entered accordingly.

It seems that the plaintiff was not satisfied with the course pursued, but insisted that a further trial should be had, and consulted various attorneys with a view of having them prosecute the case in her behalf. Finally the firm of Hancock & Spriggs was substituted as attorneys for the plaintiff, and now in her behalf makes this application to open her default and that she be given an opportunity to present her case for the consideration of the court. In their moving affidavits they concede the perjury of Dingman and the futility of pursuing the case further upon the theory that the defendant was negligent in failing to give a proper caution signal on the occasion in question, and admit that the signal was properly set at danger as the locomotive operated by the plaintiff's intestate approached. However, they now present a theory of negligence on the part of the defendant which they say was not and could not have reasonably been discovered and evidence obtained in its support until a comparatively recent date.

The present theory advanced in behalf of plaintiff is that, assuming, as they must, the semaphore signal 3,055 feet west of the cross-over was set at caution, owing to snow being packed upon the signal disk on the morning in question, the caution signal might not have been read by plaintiff's intestate from the cab of his approaching engine until he was abreast of the signal itself; that the distance of 3,055 feet was not sufficient, considering the weight of his train and the speed at which it was traveling and with the brake equipment provided, to bring the train under control and to so reduce its speed as to take the cross-over in safety. In working upon this theory of negligence, the attorneys for plaintiff have displayed a most commendable zeal and an industry which augurs well for their futures as practitioners at the bar. Affidavits are produced tending to show that, at about the time or soon after the accident in question occurred, the defendant had carried on exhaustive tests as to the distance required to stop a train of about the weight of that wrecked traveling at a speed of 75 miles an hour.

With great industry the attorneys for the plaintiff have investigated the subject, and have obtained the affidavit of one Wirt D. Seeley, formerly in the employ of the defendant as an inspector of air brakes, and who qualifies as an expert on modern air-brake equipment. By the affidavit of this expert plaintiff attempts to show that, even though

the semaphore was set at danger as her intestate's train approached on the morning in question, yet, owing to insufficient air brakes, the signal was not given in time to permit of the engineer reducing the speed of his train sufficiently that the accident could be avoided when the cross-over was taken. Seeley makes three affidavits in connection with this motion: First, the one referred to, for the plaintiff; then, an answering one for the defendant, in which he qualifies his prior affidavit; and, finally, an affidavit in rebuttal in behalf of plaintiff, by which he attempts to fortify the position taken in his original affidavit. On the whole, the position of the proposed witness Seeley is not such as to command entire confidence in the reliability of his testimony.

The plaintiff insists that the theory which she now presents of negligence on the part of the defendant is urged in entire good faith and is the only logical explanation of the manner in which the accident occurred. From the moving affidavits it would appear that the idea of defendant's negligence in failing to furnish proper air-brake equipment to stop its fast-moving train within the limited space of 3,055 feet had come to plaintiff very recently, and that it was due to no lack of diligence on the part of plaintiff or her counsel that the matter was overlooked prior to the first trial, and that the theory is not one which, even with proper diligence, could have been sooner presented.

[1] The defendant insists, it seems to me not without reason, that were the plaintiff at this late hour to be permitted to reopen the controversy and to proceed upon this newly discovered theory of negligence, it would be unfair to the defendant; that the plaintiff has had her day in court, and that the defendant has fairly won its repose.

Plaintiff, by her affidavit, swears that she was not a party to the fraud attempted in her behalf, and knew nothing of the perjured testimony which was presented to secure a recovery in her behalf upon the previous trial. I am very much inclined to credit plaintiff's statement as to this; but, at the same time, the fraud was committed by an agent working in her behalf, and it seems to me that it would be inequitable and unjust to the defendant that she should be relieved from the instrumentalities exercised in her interest. It is fair to assume that, had not the diligence of defendant's attorneys unearthed the iniquity disclosed by Dingman's confession, the plaintiff would have pursued the theory upon which the case was first tried, and continued to present the same or perhaps other perjured testimony in support of the same theory of negligence as that urged upon the first trial, and that the plaintiff would finally have obtained a verdict which, while clearly against the weight of evidence, as was the first finding of the jury, the court would nevertheless have, under the practice and decisions, been compelled to allow to stand. Except for the discernment of the trial justice, the plaintiff would probably to-day be in the enjoyment of the avails of the fraud perpetrated in her behalf.

While I am not unmindful that justice demands that a party have the right to fairly present the issues of her case, and shall not be prejudiced by the negligence of counsel or technical errors by which she might be deprived of her rights, yet nevertheless it seems to me that it would be an abuse of discretion at this time, when the statute of

·limitations has long since run against her cause of action, to permit the opening of her default.

[2] But even if, in the interest of justice to this unfortunate plaintiff, it might be possible to overlook the wrongdoing that had been attempted in her behalf, and by which she would have profited, except for the prompt and judicious interference of the trial justice in setting aside the verdict, which impressed him as manifestly against the clear weight of evidence, and the wisdom of whose course was completely vindicated by the subsequent investigation, there are nevertheless other considerations which compel me to deny this application.

Plaintiff is now proceeding upon the theory that her intestate could not have seen the signal until abreast of it, owing to the weather conditions and to snow obscuring the signal disk. To prove such condition, plaintiff relies entirely upon the affidavit of one Reuben Yoran, an employé of the defendant, who had care of the signal lights. From a careful reading of Yoran's affidavit, I think it falls far short of showing the obscured condition of the signal light that plaintiff must assume to give force to her present theory of defendant's negligence. His affidavit is argumentative and speculative in the extreme. Yoran is flatly contradicted by the testimony of the witness Edward V. Mink, upon the trial before Mr. Justice De Angelis. It is true that Mink is an employé of defendant, but plaintiff has vouched for his veracity by obtaining and using his affidavit in support of her present application. On the trial Mink testified that he was a rear trainman on the wrecked train, and that immediately after the wreck he went back to flag any other east-bound trains following the wrecked train on track No. 1; that as he passed the distant signal he noticed it showed yellow (caution); that he went about half a mile west of the distant signal, and placed torpedoes on the track to signal any approaching east-bound train on track No. 1; that he then walked down to the signal in question, and that the signal light showed yellow the entire distance of half a mile as the witness was walking back from placing his torpedoes; that he kept watching it.

If, as would thus appear, the distant signal, indicating trouble ahead, was so plainly discernible for such a considerable distance before it was reached, plaintiff's intestate should have at once obeyed its warning, and not waited until he was abreast of the signal itself before attempting to bring his train under control. Semaphore signals are designed to be seen at least at some distance, and, unless their warnings are promptly heeded, they are useless. The engineer, Scanlon, was an old and experienced employé, and undoubtedly able to read the signals displayed for his protection and those dependent upon him. If he failed to respond with reasonable promptness to the danger signal, he was himself negligent. If Mink is correct in his version as to the distance at which the signal in question could be read by the approaching engineer, then it seems to me it is quite immaterial that the space between the distant signal and the cross-over was insufficient, with the brake equipment then in use, to permit of reducing the speed of the train sufficiently that it might take the cross-over with safety.

But assuming that, as Scanlon was rapidly approaching the location of the semaphor in question, he was unable to read it, owing to

weather conditions or other causes, what, then, was his duty? He was entirely familiar with the road and its physical features. Just prior to reaching the distant signal he had rounded the curve below Little Falls, and, according to the moving affidavit of Mink, had applied his brakes to steady the train, and the train had checked up a little. He knew by experience that the distant signal just east of this curve would inform him whether he had a clear track ahead, or otherwise. If, as he approached the location of this distant signal, owing to snow or other cause, he could not see it, or could not read it distinctly, reasonable prudence on his part should have prompted him to at once obtain control over his train. The fact that he was unable to read the signal correctly until he was abreast of it would of itself, it seems to me, in view of the terrific speed of his train, call upon the engineer, in the exercise of reasonable care, to apply his brakes.

But another very important fact appears, I think conclusively, and which in my opinion is a complete answer to plaintiff's present theory of defendant's negligence. I refer to the time when it appears plaintiff's intestate did in fact apply his air brakes at the time of the accident. As I read the moving affidavits themselves, it clearly appears that the air brakes were not applied until the train had passed the distant signal a very considerable distance at least. The plaintiff produces as a part of her moving papers an affidavit of said Edward V. Mink, above mentioned, to show the high rate of speed that the train was traveling before the wreck. In his affidavit for plaintiff, Mink further states that when the train finally came to a stop the brakes were all set, and that he does not know just how long they were on before the train came to a final stop. But this same witness (Mink) makes an answering affidavit for defendant in which he positively swears that Scanlon *never applied the brakes* on the occasion of the wreck *until after said train had reached the cross-over* upon which it was wrecked, and that said affiant had so informed plaintiff's counsel at the time of making his affidavit as a part of the moving papers hereon. If it be a fact that the deceased did not apply his air brakes until he reached the cross-over, he was guilty of contributory negligence, and it is unimportant that the distance between the distant and home signals was not sufficient to permit of stopping the train or so reducing its speed that the cross-over could have been made with safety.

[3] But, disregarding these certainly embarrassing circumstances tending to show that plaintiff's intestate neglected to apply the air brakes until about to take the cross-over, and taking the statements contained in the moving affidavits as literally true, the air brakes were certainly not applied until over half of the distance between the distant signal and the tower at the cross-over had been covered by the rapidly moving train. The train as it approached the place of the accident was concededly traveling at a very high rate of speed. The plaintiff claims it was running at the rate of 75 miles per hour, or exactly 110 feet per second.

The plaintiff makes no attempt to show just at what point it was that her intestate applied the air brakes to stop his train, except by

the affidavit of one Charles Hendrix, a mail clerk in the railway postal service. Hendrix makes affidavit that he was at work in the first car of the wrecked train; that he was standing in front of the letter cases as the train approached the cross-over; that he observed that as the train approached the tower at the cross-over, which it must be borne in mind was at a point 3,055 feet easterly of the distant signal, the brakes on the train were applied; that the application was a severe application, and was made some time before the train struck the cross-over and was derailed; that in deponent's judgment the brakes on this train *were set for a period of from ten to fifteen seconds* before the train struck the cross-over.

Assuming that the train was traveling at the rate of 110 feet per second, as claimed by plaintiff, then the testimony of this the only witness by which she attempts to show the point at which her intestate sought to reduce the speed of his train would indicate that the brakes were not applied until he was within from 1,100 to 1,650 feet of the cross-over itself. Making due allowance for the time which plaintiff contends must be consumed in the manual operation of applying the brakes and in which they would attain their full braking efficiency, if Hendrix is to be believed, Scanlon never sought to check the speed of his train until over half the distance between the distant signal and the cross-over had been traversed. This being true, plaintiff's intestate was guilty of contributory negligence, which would preclude any recovery herein. And under these facts plaintiff's present theory that the defendant was negligent in allowing an insufficient distance in which to reduce the speed of the train with the air-brake equipment provided becomes entirely immaterial.

Entertaining the views above expressed, I am constrained to deny plaintiff's application.