## PACE v. PACE BROS. CO. et al. (LOVERIDGE et al., Interveners).

No. 5727. Decided June 19, 1936. (59 P. [2d] 1.)

*Irvine, Skeen & Thurman* and *Ned Warnock,* all of Salt Lake City, and *F. B. Hammond,* of Moab, for appellants.

*Lawrence Bothwell,* of Grand Junction, Colo., and *F. W. Keller,* of Monticello, for respondents.

*Bagley, Judd & Ray,* of Salt Lake City, as amicus curiae.

WOLFE, Justice.

This is an action on several promissory notes and for the foreclosure of two mortgages given as security therefor. The interveners are unsecured creditors. They attack the notes and mortgages on the ground that the corporation had no power to execute them. The original notes and mortgage were given in payment of the purchase price of the stock of the defendant company belonging to Sidney D. Pace, father of plaintiff and a large stockholder and officer of the defendant company. There were originally twenty notes of $3,000 each, all dated January, 1923, fifteen of which were secured by a mortgage on about 9,000 acres of land in Grand County, Utah. The notes matured one each year for twenty years. At the time of the trial notes Nos. 6 to 12, both inclusive, were in default. Notes Nos. 13 to 20 were not yet due. In 1930 a note for $18,000 was executed by the defendant corporation to Sidney D. Pace to take up notes Nos. 1 to 5 with interest accumulated. This note was secured by real estate in Colorado. This note matured January 15, 1935. The defendant corporation was formed in 1913 by Sidney D. Pace together with his brothers who conveyed their interests in lands, cattle, and horses to it. Sidney Pace con-

veyed property valued at $66,400 to the corporation and was for ten years its president. At the time of the purchase of his stock, Sidney Pace's interest in the corporation was valued at $60,000. The corporation was at that time solvent and owed no debts and its net worth was considerably greater than Sidney Pace's interest in the corporation. The business it was authorized to do by its articles of incorporation was a general land and livestock business. Reece Pace is the son of Sidney Pace. He took these notes and mortgages as sole distributee of his father. Therefore he stands in the place of his father as to all defenses. No question of a bona fide purchaser for value is presented. The defendant corporation is a Utah corporation.

The opinion hereunder does not take into consideration the question of whether the rules herein laid down would be affected by the law of the state of incorporation were that other than Utah. Judgment in the lower court was in favor of plaintiff and against the defendant corporation and the interveners. Only the interveners appeal. They appeal on the ground that the property mortgaged to Sidney Pace should be applicable to the payment of their claims and those of other unsecured creditors on the ground that the mortgages are not valid for the reason that the defendant corporation under our law had no power to buy its own stock. Amicus curiæ take the opposite position, as does of course the plaintiff. Other questions are raised, such as the admission of exhibits over interveners' objections, the alleged failure of the defendant corporation to ratify the mortgage transaction, and as to whether the court could give judgment on the unmatured notes, they having contained no acceleration clause. As we view the matter, it will be unnecessary to pass on these questions. We consider the question as to whether the defendant corporation, under the circumstances in which this purchase was made, had authority to buy its own stock held by Sidney Pace. Our decision on that question will be limited strictly to the facts of this case.

In England and some of the American states it is the law

that unless permitted by statute (or in some jurisdictions by its own articles, at least as to objections by stockholders who became parties to these articles) a corporation cannot purchase its own capital stock. See notes, 61 L. R. A. 621; 25 L. R. A. (N. S.) 50; 30 L. R. A. (N. S.) 694. The majority of states hold that a corporation may buy its own stock if there is no statutory or charter prohibition if done in good faith and without injury to creditors even though there is no express statutory or charter authorization. 7 R. C. L. 548, § 528; 14a C. J. 275, § 2124; 5 Thompson on Corporations, (3d Ed.) § 4081, p. 951; *Barrett* v. *Webster Lumber Co.*, 275 Mass. 302, 175 N. E. 765; *Fremont Carriage Mfg. Co.* v. *Thomsen*, 65 Neb. 370, 91 N. W. 376; *Kennerly* v. *Columbia Chemical Corp.*, 137 Va. 240, 119 S. E. 265; *Wolf* v. *Excelsior Automatic Scale & Supply Co.*, 270 Pa. 547, 113 A. 569; *O'Brien Mercantile Co.* v. *Bay Lake Fruit Growers Ass'n*, 178 Minn. 179, 226 N. W. 513; *Davies* v. *Montana Auto Finance Corp.* (1930) 86 Mont. 500, 284 P. 267; *Porter* v. *Plymouth Gold Min. Co.*, 29 Mont. 347, 74 P. 938, 940, 101 Am. St. Rep. 569; *Cole* v. *Cole Realty Co.*, 169 Mich. 347, 135 N. W. 329; *San Antonio Hardware Co.* v. *Sanger* (Tex. Civ. App.) 151 S. W. 1104; *Iowa Lumber Co.* v. *Foster*, 49 Iowa 25, 31 Am. Rep. 140; *Rollins* v. *Shaver Wagon & Carriage Co.*, 80 Iowa 380, 45 N. W. 1037, 20 Am. St. Rep. 427; *Tierney* v. *Butler*, 144 Iowa 553, 123 N. W. 213; *Gilchrist* v. *Highfield*, 140 Wis. 476, 123 N. W. 102, 17 Ann. Cas. 1257; *Shoemaker* v. *Washburn Lumber Co.*, 97 Wis. 585, 73 N. W. 333; *Sanford* v. *First Nat. Bank*, 238 F. 298, 151 C. C. A. 314; L. R. A. notes above cited and note, 44 L. R. A. (N. S.) 156.

Appellants claim our Constitution and statutes are restrictive. They cite article 12, § 5, of the Constitution; 18-2-17, 18-2-18, 33-1-5, R. S. Utah 1933, and the penal statute 103-12-4, R. S. 1933. It is claimed these statutes reveal a public policy of the state against corporations buying their own stock and that 103-12-4, subd. 2, expressly prohibits it. This

section provides that it shall be a misdemeanor for any director to concur in a vote.

"To divide, withdraw or in any manner, except as provided by law, pay to the stockholders, or any of them, any part of the capital of the corporation."

This subsection was taken from section 560 of the Penal Code of California before the California amendment of 1931. The words are exactly the same. There was also a like prohibition in section 309, Civil Code of California which permitted certain exceptions. The phrase "except as provided by law" in section 560, therefore, undoubtedly referred to these exceptions and to any exceptions which the court read into section 309, which it did in the cases of *Ralston* v. *Bank of California*, 112 Cal. 208, 44 P. 476, *Stewart* v. *Stewart Hotel Company*, 33 Cal. App. 167, 164 P. 620, and *Schulte* v. *Boulevard Gardens Land Co.* (1913) 164 Cal. 464, 129 P. 582, 583, 44 L. R. A. (N. S.) 156, Ann. Cas. 1914B, 1013. In the Ralston Case it was held a corporation could buy its stock to protect itself. Where a stockholder owed the corporation money it may take the stock in payment, at least if the debt is equal to or greater than the stock. See *In re Castle Braid Co.* (D. C.) 145 F. 224. In the Stewart Case a stockholder agreed to pay all the indebtedness which the court found to be more than the assets on conveyance to him of said assets. In the Schulte Case it was held that a written agreement by the company to repurchase its own stock as part consideration for the purchase by the stockholder could be carried out by the corporation if it did not injure creditors. But in the Schulte Case the court said:

"In other jurisdictions, the authorities show a sharp conflict over the question whether, in the absence of any statutory or charter restrictions, a corporation may employ its assets for the purchase of shares of its own stock. Cook on Corp. (6th Ed.) § 311. But, in view of the Code provisions to which we have referred, it cannot be doubted that, in this state, a corporation is not authorized to make such purchase, since the result would be to illegally withdraw and pay to a stockholder a part of the 'capital stock.' *Bank of San Luis Obispo*

v. *Wickersham*, 99 Cal. 655, 661, 34 P. 444. The want of power to buy its own stock does not prohibit a corporation from taking the stock in satisfaction of a loan, or when otherwise necessary to save itself from loss (*Ralston* v. *Bank of California*, 112 Cal. 208, 213, 44 P. 476), but the general rule is, as above stated, that the purchase is unauthorized. Thus, this court has condemned, as in violation of section 309, a by-law assuming to give to any stockholder the right, upon sixty days' notice, to withdraw from the corporation and to receive, upon surrender of his stock, the amount paid therefor. *Vercoutere* v. *Golden State L. Co.*, 116 Cal. 410, 48 P. 375."

In the instant case the purchase of Sidney Pace's stock does appear not to have been done for the protection of the company, but for the benefit and accommodation of Pace. In California before 1917, with the civil and criminal statutes reading as they did, it appears that such purchase would have been ultra vires. Without the civil section but with the same section from the Criminal Code, is it prohibited in this state? (18-2-17, R. S. 1933, contains a civil prohibition against dividing, withdrawing, or paying except as provided by law to stockholders any part of the capital of the corporation, but such was not a part of the Civil Code before 1933). It would seem that the implication from subdivision 2, 103-12-4, which makes it a misdemeanor for a director to concur in any vote by which it is intended to pay to a stockholder any portion of the capital was that it would be against public policy to do the very thing which makes it a crime for such director to concur in. Moreover, the giving of a note and mortgage on the property of the corporation which is foreclosed by the original holder of the note or by one not standing in the relation of a bona fide purchaser of said note and mortgage is, in effect, a payment of capital, because the capital ultimately reaches the seller of the stock. We see no reason why the prohibition against "paying" to a stockholder a part of the capital does not include buying his stock. Certainly it could hardly mean paying a stockholder who was a creditor his debt. It would be too narrow a construction to say it meant only a payment by way of a distribution or a division or a gift. A division is separately

prohibited. Moreover, the phrase "or any of them" is convincing that it does not contemplate purely a division pro rata, but the prohibition goes to paying any of the capital to any stockholder or stockholders, whether one or more. To pay is defined by Webster's New International Dictionary, "to satisfy for services rendered or property delivered, to discharge one's obligation, to make due return to, to compensate, remunerate." Furthermore, the payment of capital for a certificate of stock is nothing more or less than a withdrawal. When a person withdraws, he surrenders his stock certificate and pulls out his pro rata or other portion of the property. 103-12-4, subd. 2, impliedly prohibits a withdrawal of capital. To pay capital for a surrender of a stockholder's rights in the corporation works a withdrawal of capital. And where the company's capital is mortgaged for a debt incurred for the purchase of such surrender and the mortgage is foreclosed, it likewise results in a withdrawal of capital just as effectively and perhaps more so than if the capital had been turned over outright for the certificate. Certainly, the ordinary connotation of payment of capital would include payment for stock or a purchase of the stock. California seems to have so held. Unless, therefore, somewhere it is provided by law that the transaction in this case can be accomplished, it is prohibited. It is contended that our statutes do authorize corporations to purchase their own stock. It is said this follows from 18-2-16, subd. 6, R. S. 1933, which reads, without matters immaterial to this case, as follows: "The corporation in its name shall have power: * * * To buy, * * * sell or otherwise dispose of, personal property." 18-2-33 states, "Stock shall be deemed personal property." It is argued that a corporation's own stock is personal property and therefore by putting these two sections together corporations in Utah are authorized to buy their own stock because they are authorized to buy personal property.

We do not think such deduction permissible. In the first place subdivision 6, 18-2-16, must be read in the light of the objects of the corporation. Subdivision 6 also authorizes

a corporation to sell personal property. Would these two words permit a lumber company or a utility company or any corporation to do a pawnbroker's or stockbroker's business? These latter businesses consist in buying and selling personal property. 18-2-16 was meant to supply a power in the corporation law for corporations to buy and sell, etc., as is incidental to their businesses. They probably would have this power anyway. Investment of surplus funds in prudent purchases of securities would be an incident of the business. And in this sense, if it were not for 103-12-4, it might be treated as an authorization for any corporation to invest its surplus as an incident to good business in its own stock at fair market values as well as in other securities. New Jersey in *Chapman* v. *Iron Clad Rheostat Co.*, 62 N. J. Law, 497, 41 A. 690, held that the Corporation Act by which shares of stock were declared personal property, together with the provision that corporations were vested with the power to purchase personal property as the purposes of the corporation shall require, *coupled with a provision that permitted corporations to own shares of their own capital stock,* implied a legislative grant of power to buy its stock *in all cases where the purposes of the corporation require it.* This case was followed in *Oliver* v. *Rahway Ice Co.*, 64 N. J. Eq. 596, 54 A. 460, and *Berger* v. *United States Steel Corp.*, 63 N. J. Eq. 809, 53 A. 68. In the case of *Knickerbocker Importation Co.* v. *State Board of Assessors,* 74 N. J. Law, 583, 65 A. 913, 7 L. R. A. (N. S.) 885, it was held that the purchase was not for legitimate corporate purposes. New Jersey did not have a prohibition such as our 103-12-4, subd. 2. If we give 18-2-16 the most favorable construction, as contended for by plaintiff, it would go only to the extent of an authorization of a corporation to purchase its own stock for legitimate corporate purposes. The purchase in the instant case cannot be said to have been for corporate purposes.

Furthermore, the strong implied prohibition of 103-12-4 on this special case of paying assets for its own stock would

have to be construed as an exception to any general authority to buy personal property. For, if this were not done, the implied prohibition against paying its assets for its own stock would be meaningless. One statute would make it unlawful for a corporation to pay to a stockholder any part of its assets which includes, as stated above, paying assets for its stock certificates; another section is construed as permitting the corporation to do so. This would make that part of 103-12-4 abortive. It is difficult to see how a corporation could buy its own stock without paying to the stockholder a part of its assets. That is impliedly prohibited by special language. There are many ways in which corporations may buy personal property without buying their own stock. Consequently, the implied prohibition against the purchase of its stock is simply one exception to the general authority to buy personal property. This sort of articulation makes sense.

It appears that Montana has a statute reading substantially like section 309 of the California Civil Code. The law (Civ. Code Mont. 1895, § 438), also provided that the directors must not "reduce or increase the capital stock." In the early case of *Porter* v. *Plymouth Gold Min. Co.* (1904), supra, it was held that the mere repurchase of stock would not tend to decrease the assets unless the directors should absolutely merge or extinguish the stock after its repurchase, and that since it was unlawful to decrease the capital stock, presumptively the directors would not violate the law, therefore it must be presumed that the directors were only holding the stock in their treasury for resale. The court said, speaking of the repurchase of stock:

"The company could then own and deal with it just the same as it had done before the sale. It could be sold and issued again. * * * When it is transferred to the company, it becomes a part of its property. It is there for *the creditors* and stockholders. The capital stock is not decreased. A portion of the capital of the company may be unavailable until the stock is again sold and issued, but nothing is destroyed." (Italics ours.)

It may be remarked that it would give little comfort to a creditor if he found all the assets gone but the treasury full of the corporation's own stock certificates paid for by its assets. It appears to us the reasoning of this case is fallacious.

"It is no answer to say that shares having a market value must be regarded like any other personal property, and that no person is injured if a solvent corporation in good faith, purchases shares in itself at their market value, inasmuch as the shares so purchased are property in the hands of the company and may at any time be reissued or sold. No verbiage can disguise the fact that a purchase by a corporation of shares in itself really amounts to a reduction of the company's assets, and that the shares purchased do in fact remain extinguished, at least until a reissue has taken place." Morawetz on Private Corps., § 112.

The remarkable part of the decision above quoted from is that it did not consider anywhere the effect of the clause reading, "or pay to the stockholders, or any of them, any part of the capital stock," but only the clause respecting the reduction or increase of capital stock. This is the more strange because the Montana section was evidently taken from the California Civ. Code, § 309. The Montana case of *Davies* v. *Montana Auto Finance Corp.* (1930), supra, followed this case without considering the express prohibition against paying capital to a stockholder. But in both these Montana cases the situation was one where the corporation had sold stock agreeing to repurchase on certain conditions. This was one of the exceptions which the California courts grafted on to the statute and which it is generally held may be done in those states which hold that a corporation cannot purchase its own stock.

North Carolina is another state which holds with the general rule that unless there is an implied or express prohibition the corporation may purchase its own stock. Section 1179, North Carolina Code 1927, provides that, "no corporation may * * * reduce, divide, withdraw, or in any way pay to any stockholder any part of its capital stock ex-

cept according to this chapter." This part was passed in 1901. The case of *Blalock* v. *Kernersville Mfg. Co.*, 110 N. C. 99, 14 S. E. 501 was decided in 1892. We have been referred to no North Carolina case construing this provision. Counsel for the parties and amicus curiae have at our request made an examination of the statutes in the states which hold that a corporation may purchase its own stock in the absence of an express or implied prohibition. Of these states only Montana, North Carolina, New York, and Washington seem to have statutes in respect to paying capital to stockholders with the same wording as California. As pointed out, Montana seems substantially to have ignored consideration of this part of the section in its decisions and the North Carolina Case was decided before the wording was adopted in that state. In New York there was a provision like 103-12-4, subd. 2, but also a further provision prohibiting a director to concur in a vote "to apply any portion of the funds of their corporation except surplus, profits, directly or indirectly to the purchase of shares of its own stock." (1 Rev. St. N. Y. [1st Ed.] p. 589, § 1, subd. 5). The New York Legislature, therefore, by express implication granted the right of a corporation to buy its stock with surplus. Whether from surplus above debts or above its named capital, does not appear. Moreover, under an old New York law (1 Rev. St. [1st Ed.] p. 589, pt. 2, tit. 2, art. 1, § 1) which read,

"It shall not be lawful for the directors of any monied corporation * * * to divide, withdraw, or in any manner pay to the stockholders, or any of them, any part of the capital stock of the corporation,"

it was held in *Gillet* v. *Moody*, 3 N. Y. 479, that a moneyed corporation could not purchase from one of its stockholders his stock by payment of bonds belonging to the corporation. It was likewise so held in the early case of *Johnson* v. *Bush* (1848) 3 Barb. Ch. 207, at page 241. These cases therefore throw light on the above cases and show that were it not

for the provision permitting purchase of stock from surplus, the remainder of the New York Statute, reading as does our section 103-12-4, would prohibit corporations from buying their own stock, perhaps with certain exceptions such as agreements coupled with a purchase of stock. *Richards* v. *Ernst Wiener Co.*, 207 N. Y. 59, 100 N. E. 592. In 1828, New York passed a law which read in part as follows:

"It shall not be lawful for the directors or managers of any incorporated company in this state to make dividends excepting from the surplus profits arising from the business of such corporation; and it shall be unlawful for the directors of any such company to divide, withdraw, or in any way pay to the stockholders or any of them, any part of the capital stock of such company, or to reduce the said capital stock without the consent of the legislature."

In *Williams* v. *Western U. Tel. Co.*, 93 N. Y. 162, it was held that the term "capital stock" meant "property of the corporation, contributed by the stockholders or otherwise obtained, to the extent required by its charter." Anything above that was "surplus." In this case it appears to have been assumed that the property mortgaged to Sidney Pace in 1923 was "capital" of the company. No argument is made that it belonged to the surplus. There is no evidence that it had been set aside on the books as surplus. We have evidence that the company was solvent at that time after deducting the amount of the indebtedness evidenced by the notes to Sidney Pace, but there is no evidence that this property mortgaged was not part of the capital of the company, giving the word "capital" the definition of being that property which the company holds to make up the limit called for by its articles of incorporation. Moreover, ordinarily surplus would be divided among the stockholders as a dividend. This was a payment to a single stockholder for his stock certificate or for the surrender of his rights in the company. We are not prepared at this time to say what the effect would be if it was shown that the property mortgaged was at the time "surplus" in the sense that it was in excess of the amount of property called for by the articles

as constituting the capital stock. That question need not be considered. In consequence, it is even less necessary to consider whether in order to be surplus, certain property must be set aside and earmarked as such, and what sort of property can be earmarked as surplus. Washington has a statute (Rem. & Bal. Code Wash. § 3697) exactly like 103-12-4, subd. 2, except that the words, "except as provided by law," are omitted. While that state adheres to the trust fund doctrine, whereas we do not, the case of *Kom* v. *Cody Detective Agency,* 76 Wash. 540, 136 P. 1155, 50 L. R. A. (N. S.) 1073, construed the statute reading as does ours to also prohibit it. *Tait* v. *Pigott,* 32 Wash. 344, 73 P. 364.

In most of the states there are statutes prohibiting the payment of dividends out of capital. Many of them make special provision for the reduction of the capital stock and provide penalties for knowingly paying dividends out of capital or when insolvent or dividing or withdrawing assets when insolvent or so as to render the corporation insolvent, but the only states which we are informed about which have a like provision as 103-12-4, subd. 2, are California, New York, Montana, North Carolina, and Washington.

California has taken its section 309, Civil Code, and section 560 of the Penal Code seriously. While no case has come to our attention where the corporation bought from a single or small group of stockholders their stock independently of an agreement to repurchase as part of a subscription agreement, in the case of *Vercoutere* v. *Golden State Land Co.* (1897) 116 Cal. 410, 48 P. 375, a stockholder sued the corporation to require it to buy his stock in pursuance of a by-law which gave the stockholder a right on 60 days' notice to surrender his stock and receive the amount due him. The court held the by-law invalid as against section 309. In *Kohl* v. *Lilienthal,* (1889) 81 Cal. 378, 387, 20 P. 401, 22 P. 689, 692, 6 L. R. A. 520, the court said:

"The inhibition of the statute has regard, not only to the rights of existing creditors, but to those of all persons who may deal with the corporation on the faith that its capital has not been divided. Cer-

tainly, the effect and operation of the statute, if unrepealed by judicial construction, would be to afford a large measure of protection to future as well as existing stockholders and creditors; and, having that effect, it ought to be supposed that such was its purpose."

The first case was *Martin* v. *Zellerbach* (1869) 38 Cal. 300, 99 Am. Dec. 365, where all the property in corporation A. was transferred to corporation B. and the stock of the latter then distributed to the owners of the stock of corporation A. It was followed by *San Francisco & N. P. R. Co.* v. *Bee* (1874) 48 Cal. 398. *Schaake* v. *Eagle Automatic Can Co.*, 135 Cal. 472, 63 P. 1025, 67 P. 759. In these four cases the stockholders of the old corporation did not receive the assets of the old corporation, but a new corporation received them, and the stockholders of the old received stock in the new. *Hedges* v. *Frink* (1917) 174 Cal. 552, 163 P. 884, involved a division of assets. A trustee was given notes of the corporation with instructions to collect and divide the proceeds among the stockholders. And this was after all the other assets of the company had been transferred to the chief creditor who assumed all the liabilities of the company. In *Tapscott* v. *Mexican Colorado River Land Co.* (1908) 153 Cal. 664, 96 P. 271, a scheme whereby all the assets of a corporation were sold to Otis with an agreement that he would use them to purchase the stock of the stockholders of the corporation was held in effect a division of the assets and void as against section 309. In the case of *Schulte* v. *Boulevard Gardens Land Co.* (1913), supra, we have the first definite statement that in California "in view of the Code provisions" a corporation is not permitted to purchase its own stock. Exception was made where as part of the consideration for the purchase it was agreed to buy back. This was on the ground that such sale was not absolute, it being in the well recognized class of contracts known as "sale or return." The title passed to the purchaser for the time being, but subject to the option of the purchaser to rescind and return the property within the time stipulated. Contracts for the repur-

chase of stock sold to employes as a part of the contract of employment have been held to be in the same class. *Richards* v. *Ernst Wiener Co.*, supra; *Hyman* v. *New York Urban Real Estate Co.*, 79 Misc. 439, 140 N. Y. S. 138; see note, 25 L. R. A. (N. S.) 53.

103-12-4 first appeared in our law in the Comp. Laws 1876. None of the California decisions except *Martin* v. *Zellerbach* (1869), supra, can be said to be imported with it. But the decisions are persuasive upon us. Moreover, we can see no reasonable way to escape from the wording and intent of 103-12-4, subd. 2. It was meant to prevent assets from being used to liquidate the stock of the stockholders. Future as well as present creditors should be able to rely on the implied representation that the corporation holds assets as represented by its outstanding stock. We think the distinction made by the Montana court impracticable and against the plain wording of the statute. Such a rule leaves the legality of a corporation's purchase of its own stock dependent upon whether it was purchased for the purpose of retiring or for reselling. If such a rule is to prevail, the Legislature should provide it. Morawetz on Private Corporations, § 112, states:

"A purchase by a corporation of shares of its own stock in effect amounts to a withdrawal of the shareholder whose shares are purchased, from membership in the company, and a repayment of his proportionate share of the company's assets. There is no substitution of membership under these circumstances, as in case of a purchase and transfer of shares to a third person, but the members of the company and the amount of its capital are actually diminished. Whatever a transaction of this character may be called in legal phraseology, it is clear that it really involves an alteration of the company's constitution just as the withdrawal of a member of a copartnership, with his proportionate share of the joint funds, involves an alteration of the constitution of copartnership. The amount of the company's assets and the number of its shareholders are diminished; every continuing shareholder is injured by the reduction of the fund contributed for the common venture; and the creditors who have trusted the company upon the security of the capital originally subscribed, or who are entitled to expect that amount of security, are entitled to

complain. * * * The fact that such a transaction may not necessarily be injurious to any person is not a sufficient reason for supporting it. It is contrary to the fundamental agreement of the shareholders, and is condemned by the plainest dictates of sound policy. To allow the directors to exercise such a power would be a fruitful source of unfairness, mismanagement, and corruption. It is for these reasons that a shareholder cannot be allowed to withdraw from the corporation with his proportionate amount of capital, either by a release and cancelation before the shares have been paid up, or by a purchase of the shares with the company's funds."

In the case of *Hunter* v. *Garanflo*, 246 Mo. 131, 151 S. W. 741, it was held that a mortgage on corporate real estate given to secure notes in payment of shares of its own stock purchased either by the corporation or its president is ultra vires and void. This decision was put squarely on the constitutional provision (Const. Mo. art. 12, § 8) reading like ours, that "no corporation shall issue stock or bonds, except for money paid, labor done or property actually received," and on the further constitutional provision that "no corporation shall engage in business other than that expressly authorized in its charter or the law under which it may have been or hereafter may be organized." (art. 12, § 7).

Every state which has come to our attention as having such a statute as 103-12-4, except Montana, has interpreted this section to prohibit a corporation from buying its own stock.

It is argued that the words, "except as provided by law," refer not only to the statutory law, but to the general law as it exists in the state, and is enunciated by the courts. We cannot subscribe to this. The words, "provided by law," seem to smack of the flavor of something done ■ by the Legislature; something expressed and supplied by definite intention, rather than something which exists in the body of our unexpressed law. Moreover, such an interpretation would defeat any prohibition. If the statute read that "liquor should not be sold otherwise than as provided by law," and the courts determined that it could be

sold in certain ways not set out in the statutes, such decision would then become as "provided by law" and the prohibition in that regard would disappear. Exceptions sufficient to obliterate the prohibition might be thus imported under the phrase, "provided by law." The statute specifically by implication prohibits payment of capital to a stockholder. The court says it may nevertheless be done. The court's saying it makes it "provided by law"; hence the specific prohibition is negatived by an exception enunciated by the court imported under the phrase "provided by law." The argument is unsound. The courts must not make exceptions and cannot construe directly against the prohibition. The words, "except as provided by law," have a definite office as part of 103-12-4 even though at the time of this purchase of stock we did not have any civil code provision with exceptions as in the case of California's section 309. Payment of capital to stockholders could be made in case of distribution on dissolution, and perhaps in other exceptional cases. This would give office to the phrase, "except as provided by law."

We believe that 103-12-4, subd. 2, was designed to prevent the purchase by a corporation of its own stock even though at the time of the purchase it was not insolvent nor would be by such purchase rendered insolvent, at least in cases where it was not for the protection of the corporation or for its legitimate corporate purposes. If there are any exceptions to this statement they are not presented by this case and we need not consider them. The purchase by the defendant company of its own stock from Sidney Pace was null and void. Reece Pace, standing in the place of Sidney, having succeeded to the note and mortgage by inheritance, is also barred from recovering on the note. The note for $18,000 given in place of the original notes stands in the same category. The estate of Sidney Pace is entitled to the stock he pretended to sell to the corporation, but in this action it cannot be decreed.

The judgment of the lower court is reversed, with instructions to find the issues in favor of the interveners. Costs to appellants.

ELIAS HANSEN, C. J., and FOLLAND, EPHRAIM HANSON, and MOFFAT, JJ., concur.